**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

UNITED STATES OF AMERICA,

                Plaintiff,

-vs-

EMANUELE PALMA,

                Defendant.

_____ /

2:19-cr-20626-NGE-DRG

**MOTION TO DISMISS COUNTS 2–13 AND TO DISMISS IN PART COUNT 1**

HON. NANCY G. EDMUNDS

Defendant Emanuele Palma moves, pursuant to Federal Rule of Criminal Procedure 12(b)(3), to dismiss Counts 2 through 13 of the Indictment against him, and to dismiss a portion of Count 1, for failure to state an offense.  This motion is based on the supporting memorandum of law; the pleadings and records on file in this matter; and such evidence and argument as may be presented prior to and at the hearing on this motion.

Pursuant to Local Rule 7.1(a), on June 26, 2020, Mr. Palma requested the government's concurrence in this motion, which the government declined to provide.

Dated:  July 8, 2020

Respectfully submitted,

/s/ Greg D. Andres
GREG D. ANDRES
(NY Bar No. 2845568)
NEIL H. MACBRIDE
(DC Bar No. 439137 )
PAUL J. NATHANSON
(DC Bar No. 982269)
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
(212) 450-4000
greg.andres@davispolk.com

/s/ Kenneth M. Mogill
KENNETH M. MOGILL
(MI Bar No. P17865)
Mogill, Posner & Cohen
27 East Flint, 2nd Fl.
Lake Orion, MI 48362
(248) 814-9470
kmogill@bignet.net

Attorneys for Emanuele Palma

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

UNITED STATES OF AMERICA,

               Plaintiff,

-vs-

EMANUELE PALMA,

               Defendant.

_____ /

2:19-cr-20626-NGE-DRG

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS COUNTS 2–13 AND TO DISMISS IN PART COUNT 1**

HON. NANCY G. EDMUNDS

## ISSUES PRESENTED

1. Whether the Court should dismiss Counts 2 through 7, which charge Mr. Palma with violations of the Clean Air Act based on alleged misstatements in Fiat Chrysler's applications to regulators, where the Indictment fails to allege that Mr. Palma was responsible for those applications, fails to allege that Mr. Palma willfully caused his employer to make the alleged misstatements, and fails to identify the purported misstatement underlying three of the counts.

2. Whether the Court should dismiss Counts 8 through 11, which charge Mr. Palma with wire fraud, where the Indictment does not allege a cognizable property interest as the object of the purported scheme to defraud under the Supreme Court's recent decision in *Kelly v. United States*, 140 S. Ct. 1565 (2020), and where three of the four charged communications were not made "in furtherance" of the alleged scheme.

3. Whether the Court should dismiss Counts 12 and 13, which charge Mr. Palma with making false statements, where each count is based on a statement that is truthful on its face, even as alleged in the Indictment.

4. Whether the Court should dismiss the first object of Count 1, which charges Mr. Palma with a conspiracy to commit wire fraud, where the alleged substantive offense does not constitute wire fraud as a matter of law.

## <u>STATEMENT OF AUTHORITY FOR RELIEF SOUGHT (LR 7.1(d)(2))</u>

1. The most appropriate authority for relief sought with respect to Counts 2 through 7 is *United States v. Landham*, 251 F.3d 1072 (6th Cir. 2001), which provides that an Indictment must contain "such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged," *id.* at 1079; and *United States v. Brown*, 151 F.3d 476 (6th Cir. 1998), which provides that a defendant must act with "specific intent . . . to disobey or disregard the law" in order to be convicted of causing a false statement under 18 U.S.C. § 2, *see Brown*, 151 F.3d at 486.

2. The most appropriate authority for relief sought with respect to Counts 8 through 11 is *Kelly v. United States*, 140 S. Ct. 1565 (2020), which provides that wire fraud only reaches schemes to deprive victims of money or a cognizable property interest, *id.* at 1571; and *United States v. Hartsel*, 199 F.3d 812 (6th Cir. 1999), which provides that a charged wire communication must be used to aid or further the purported scheme, *id.* at 818.

3. The most appropriate authority for relief sought with respect to Counts 12 and 13 is *United States v. Gatewood*, 173 F.3d 983 (6th Cir. 1999), which provides that a prosecution under 18 U.S.C. § 1001 cannot be predicated on a statement that "on its face is not false."  *Gatewood*, 173 F.3d at 987.

4. The most appropriate authority for relief sought with respect to Count 1 is *Kelly v. United States*, 140 S. Ct. 1565 (2020), which recognizes that where there is no legally cognizable scheme to defraud, both the conspiracy count and underlying substantive offense should be dismissed. *Id.* at 1571 & n.1.

# <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ................................................................................................. 2

    A.   Mr. Palma's Work on the Subject Vehicles ............................................ 2

    B.   The Regulatory Approval Process ......................................................... 3

    C.   Investigation of FCA ............................................................................ 6

    D.   Indictment ............................................................................................ 7

LEGAL STANDARD .......................................................................................... 7

ARGUMENT .................................................................................................... 9

I.    COUNTS 2–7 FAIL TO ALLEGE FACTS THAT IN LAW CONSTITUTE AN
       OFFENSE. ................................................................................................ 10

II.   COUNTS 8–11 FAIL TO ALLEGE FACTS THAT CONSTITUTE WIRE FRAUD. ....... 15

    A.   Counts 8–11 Fail To Allege a Cognizable Property Interest. ................. 16

         i.    Regulators ................................................................................ 17

         ii.   FCA's Customers ..................................................................... 19

    B.   The Communications Charged in Counts 8, 9, and 11 Were Not Made "In
       Furtherance" of the Alleged Scheme. ................................................... 21

         i.    Count 8 ..................................................................................... 23

         ii.   Count 9 ..................................................................................... 24

         iii.  Count 11 ................................................................................... 26

III.  COUNTS 12 AND 13 FAIL TO ALLEGE ESSENTIAL ELEMENTS OF A
      SECTION 1001 VIOLATION. ....................................................................... 27

    A.   Count 12 ............................................................................................. 30

    B.   Count 13 ............................................................................................. 32

IV.  THE CONSPIRACY TO COMMIT WIRE FRAUD CHARGED IN COUNT 1
      SHOULD BE DISMISSED. ............................................................................. 33

CONCLUSION ................................................................................................. 35

# TABLE OF AUTHORITIES

## CASES

PAGE(S)

*Bryan v. United States*, 524 U.S. 184 (1998) ............................................................ 11

*Carpenter v. United States*, 484 U.S. 19 (1987) ......................................................... 22

*Cleveland v. United States*, 531 U.S. 12 (2000) ................................................... 17, 18

*Coles v. Smith*, 577 F. App'x 502 (6th Cir. 2014) ........................................................ 8

*Hamling v. United States*, 418 U.S. 87 (1974) ......................................................... 7, 8

*Jones v. United States*, 526 U.S. 227 (1999) .............................................................. 7

*Kann v. United States*, 323 U.S. 88 (1944) ............................................................... 24

*Kelly v. United States*, 140 S. Ct. 1565 (2020) ................................................. *passim*

*Parr v. United States*, 363 U.S. 370 (1960) ............................................................. 22

*Russell v. United States*, 369 U.S. 749 (1962) ........................................................... 8

*Schmuck v. United States*, 489 U.S. 705 (1989) ....................................................... 22

*Toulabi v. United States*, 875 F.2d 122 (7th Cir. 1989) ...................................... 18, 20

*United States v. Bobo*, 344 F.3d 1076 (11th Cir. 2003) ............................................ 33

*United States v. Brown*, 151 F.3d 476 (6th Cir. 1998) .............................................. 13

*United States v. Castile*, 795 F.2d 1273 (6th Cir. 1986) ........................................... 23

*United States v. Cecil*, 608 F.2d 1294 (9th Cir. 1979) ............................................... 8

*United States v. Craig*, 401 F. Supp. 3d 49 (D.D.C. 2019) ...................................... 29

*United States v. Cunningham*, 679 F.3d 355 (6th Cir. 2012) .................................... 15

*United States v. Dipentino*, 242 F.3d 1090 (9th Cir. 2001) ...................................... 11

*United States v. Frost*, 125 F.3d 346 (6th Cir. 1997) ............................................... 23

*United States v. Gahagan*, 881 F.2d 1380 (6th Cir. 1989) ....................................... 30

*United States v. Gatewood*, 173 F.3d 983 (6th Cir. 1999) ................................ *passim*

*United States v. Hartsel*, 199 F.3d 812 (6th Cir. 1999) ..................................... *passim*

*United States v. Hixon*, 987 F.2d 1261 (6th Cir. 1993) ................................. 30

*United States v. Jones*, 542 F.2d 661 (6th Cir. 1976) .................................... 9

*United States v. Kato*, 878 F.2d 267 (9th Cir. 1989) ........................... 18, 20

*United States v. Keene*, 959 F.2d 237 (Table), 1992 WL 68285 (6th Cir. Apr. 6, 1992) ........... 23

*United States v. Landham*, 251 F.3d 1072 (6th Cir. 2001) .................... 8

*United States v. Levin*, 973 F.2d 463 (6th Cir. 1992) .............................. 9

*United States v. Manarite*, 44 F.3d 1407 (9th Cir. 1995) ......................... 33

*United States v. Maze*, 414 U.S. 395 (1974) .......................................... 21

*United States v. Murphy*, 836 F.2d 248 (6th Cir. 1988) .......................... 18

*United States v. Rogers*, 769 F.3d 372 (6th Cir. 2014) ........................... 33

*United States v. Sadler*, 750 F.3d 585 (6th Cir. 2014) ............................ 17

*United States v. Schwartz*, 924 F.2d 410 (2d Cir. 1991) ......................... 18

*United States v. Shurelds*, 173 F.3d 430 (Table), 1999 WL 137636 (6th Cir. Mar. 2, 1999) ...... 11

*United States v. Smith*, Criminal Action No. 3:08-cr-31-JMH, 2011 WL 2417051 (E.D. Ky. June 13, 2011) ........................................................... 23

*United States v. Steffen*, 687 F.3d 1104 (8th Cir. 2012) .......................... 15

*United States v. Superior Growers Supply, Inc.*, 982 F.2d 173 (6th Cir. 1992) ...................... 7, 8

*United States v. Trie*, 21 F. Supp. 2d 7 (D.D.C. 1998) ............................ 15

*United States v. Weimert*, 819 F.3d 351 (7th Cir. 2016) .......................... 21

*United States v. Winchester*, 407 F. Supp. 261 (D. Del. 1975) .................. 14

### STATUTES & RULES

18 U.S.C. § 2 .................................................................................. 12, 13

18 U.S.C. § 1001 ......................................................................... *passim*

18 U.S.C. § 1343 ............................................................................... 15

40 C.F.R. § 86.1803–01 ...................................................................... 5

40 C.F.R. § 86.1809–01 ...................................................................... 5

40 C.F.R. § 86.1809–10 ...................................................................... 5

40 C.F.R. § 86.1809–12 ........................................................................................... 5

42 U.S.C. § 7413 ............................................................................................. 10, 11

42 U.S.C. § 7522 ..................................................................................................... 5

## PRELIMINARY STATEMENT

The Indictment alleges that Mr. Palma, an engineer who calibrated vehicle engines for Fiat Chrysler, misled regulators, customers, and "the public" about the emission control system in two vehicle models, the Jeep Grand Cherokee and Ram 1500 for Model Years 2014–2016.  The Indictment charges Mr. Palma with conspiring to defraud the United States, violate the Clean Air Act, and commit wire fraud (Count 1); violating the Clean Air Act (Counts 2–7); committing wire fraud (Counts 8–11); and making false statements (Counts 12–13).

For the reasons stated below, the Indictment is legally flawed.  For the entirety of Counts 2 through 13, and a portion of Count 1, the Indictment either fails to allege an essential element of the charged offense or fails to allege facts that in law constitute an offense.  Specifically, Counts 2 through 7 charge Mr. Palma with violations of the Clean Air Act based on alleged misstatements in Fiat Chrysler's applications to regulators.  But the Indictment fails to allege that Mr. Palma was responsible for those applications; fails to allege that Mr. Palma willfully caused his employer to make the alleged misstatements, as the relevant statute requires; and fails to identify the purported misstatement underlying three of the counts.  Counts 8 through 11, which charge Mr. Palma with wire fraud, fail to allege a cognizable property interest as the object of the purported scheme to defraud—a defect made clear by the Supreme Court's recent decision in *Kelly v.*

*United States*, 140 S. Ct. 1565 (2020).  Moreover, three of the four charged communications were not made "in furtherance" of the alleged scheme, and therefore cannot support a wire fraud charge.  Counts 12 and 13 charge Mr. Palma with making false statements, but each count is based on a statement that is truthful on its face, even as alleged in the Indictment.  And, finally, the portion of Count 1 alleging a conspiracy to commit wire fraud fails for the same reasons the substantive wire fraud counts fail: the Indictment does not allege a cognizable property interest as the object of the purported wire fraud scheme.  Mr. Palma asks the Court to dismiss that portion of Count 1 and dismiss Counts 2 through 13.

## BACKGROUND

### A.    Mr. Palma's Work on the Subject Vehicles

Mr. Palma is an Italian citizen living with his family in Bloomfield Hills, Michigan, and working in the United States as a permanent resident alien.  He moved to the United States at the request of his then-employer, VM Motori S.p.A. ("VM Motori").  By trade and education, he is an engineer who specializes in the calibration of diesel vehicle engines, *see* Indictment ¶ 4—that is, he refines the engine's software and hardware to meet targets set by the vehicle's manufacturer for safety, comfort, emissions, fuel economy, and other attributes.

After completing college and graduate school in Bologna, Italy, Mr. Palma began working in 2007 for VM Motori, an Italian engine manufacturer.  *Id.* ¶¶ 3–4.

VM Motori supplied diesel engines to automobile manufacturers around the world, including to Fiat Chrysler Automobiles ("FCA");[1] VM Motori became a wholly owned FCA subsidiary in 2013. *Id.* ¶ 3.

In 2012, Mr. Palma moved to the Michigan office of VM Motori's North American affiliate to work directly with FCA to develop and calibrate a new 3.0-liter diesel engine, which was used with the Model Year 2014–2016 versions of FCA's Jeep Grand Cherokee and Ram 1500 vehicles (the "Subject Vehicles").[2] *See id.* ¶¶ 4–7. Working with his customer, FCA, in Michigan, and with his VM Motori superiors in Italy, Mr. Palma and dozens of colleagues—some in Michigan, others at VM Motori's headquarters in Cento, Italy—helped FCA calibrate and test the engines used in the Subject Vehicles. *See id.* ¶¶ 3–4. Mr. Palma was a VM Motori employee throughout the development of the Subject Vehicles; in June 2016 he became an FCA employee. *See id.* ¶ 4.

## B.    The Regulatory Approval Process

Under the Clean Air Act, automakers must apply for and receive a certificate

---

[1] Fiat Chrysler Automobiles N.V.'s subsidiary in the United States, FCA US LLC, was formerly Chrysler Group LLC. Indictment ¶ 1. As does the Indictment, we use "FCA" to refer to both the parent company and its U.S. subsidiary (which was technically Chrysler Group LLC during some of the events described in the Indictment).

[2] Mr. Palma previously lived in the United States for about two years while working on vehicles for General Motors.

of conformity from the Environmental Protection Agency ("EPA") for each model year of vehicle they wish to sell, which confirms that the vehicle complies with the relevant regulations, including emissions standards. *Id.* ¶¶ 13, 15. To sell vehicles in the state of California, automakers must also satisfy standards established by the California Air Resources Board ("CARB"), which issues its own compliance certificate, called an executive order. *Id.* ¶ 19.

To satisfy the relevant emissions standards, each model year of vehicle must undergo a series of tests, or "cycles"—known as the "federal test procedures"—designed to measure emissions in different driving conditions. *Id.* ¶ 14. To administer these tests, an automaker places the vehicle on a "chassis dynamometer" (in essence, an automotive treadmill), which simulates driving conditions while allowing the automaker to measure tailpipe emissions and fuel consumption. *Id.* The automaker records the test results, certifies their authenticity, and submits them in its application for a certificate of conformity. *See id.* ¶¶ 14–15.

An automaker's application to regulators must also identify and explain each "Auxiliary Emission Control Device" ("AECD") installed on the vehicle. *Id.* ¶ 16. An AECD is "any element of design which senses temperature, vehicle speed, . . . or any other parameter for the purpose of activating, modulating, delaying, or deactivating the operation of any part of the emission control system." *Id.* There are many appropriate and necessary uses for AECDs, such as to protect the vehicle

against damage or facilitate engine startup.  *See id.* ¶ 17.  But if the AECD does not serve one of these purposes and is not "substantially included in the federal test procedure," and if the EPA determines that the AECD "reduce[s] the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use," then the AECD is considered a "defeat device."[3]  *Id.*  Vehicles equipped with such a device cannot receive a certificate of conformity from the EPA.  *Id.*

Beginning in 2013, FCA sought, and ultimately received, the certificates of conformity and executive orders necessary to sell the Subject Vehicles.  *See id.* ¶¶ 7, 21, 23.  At this time, Mr. Palma was not an FCA employee, had no prior experience with U.S. emissions regulations, and had no responsibility for preparing the company's certification applications.  Accordingly, he performed his job based on the terms of VM Motori's contract with FCA, relying on guidance and oversight from FCA's "Regulatory Affairs" and "Certification" groups, both of which oversaw regulatory compliance.  The Certification group decided whether calibration strategies were permissible, and the Regulatory Affairs group interacted with regulators, prepared certification applications, and reviewed and submitted the

---

[3] These devices are so labeled because they "defeat, or render inoperative" vehicle components installed in compliance with Clean Air Act regulations, 42 U.S.C. § 7522(a)(3)(B), and therefore violate federal law, *see id.*; 40 C.F.R. §§ 86.1803–01, 86.1809–01, –10, –12.

final applications.  Several communications cited by the government reference the

Certification group, *see, e.g.*, *id.* ¶¶ 45, 51, or the Regulatory Affairs group, *see,*

*e.g.*, *id.* ¶¶ 64, 65.  But the Indictment itself avoids mentioning either group.

### C.    Investigation of FCA

In September 2015, after news broke about improper emission-related

conduct at Volkswagen,[4] the EPA informed FCA that it would perform additional

emissions testing on FCA's vehicles.  *Id.* ¶ 69.  At FCA's request, Mr. Palma

worked with others at FCA beginning in late 2015 to provide regulators with data

and materials as requested.

On June 29, 2016, FCA representatives met with officials from the EPA,

CARB, and Department of Justice to discuss regulators' concerns.  *See id.* ¶ 71.

By then, FCA's highest-ranking decision-makers were involved, and were

represented by the company's general counsel as well as outside counsel at Arnold

& Porter LLP.  Attorneys at Arnold & Porter prepared and delivered a PowerPoint

presentation for the meeting, which had over thirty attendees.  *See id.* ¶ 71.

Approximately one month later, on August 3, 2016—shortly after Mr. Palma

returned from visiting family in Italy—two federal agents, one each from the FBI

---

[4] The Volkswagen emissions issues have had wide-ranging impacts on the automotive industry, including on regulators' response in this case, as Mr. Palma anticipates the evidence will show.  Even crediting all of the government's allegations as true, FCA's purported conduct is entirely unlike that with which Volkswagen was charged and to which it ultimately admitted.

and EPA, confronted Mr. Palma at his home at 9:00 pm and questioned him for more than 90 minutes.  *See id.* ¶ 104.  That interview was recorded.

### D.    Indictment

Three years later, the government indicted and arrested Mr. Palma.  Broadly stated, the allegations against Mr. Palma involve three calibration strategies used in the Subject Vehicles: (i) modeled engine temperature, or "T_Eng," which is a software function that adjusted "Exhaust Gas Recirculation" ("EGR"), one of the vehicles' emission control systems; (ii) the "valve train cleaning routine," which briefly halted EGR and used fresh air to burn off soot deposits; and (iii) "online dosing," which adjusted a different emission control system, "Selective Catalytic Reduction" ("SCR"), under certain driving conditions.  *See id.* ¶¶ 24, 30–31, 60. These strategies, the Indictment alleges, caused the Subject Vehicles to perform differently when driven in conditions reflected on the federal test procedures than when driven in conditions not reflected on the test procedures.  *Id.* ¶ 34.

## **LEGAL STANDARD**

To survive a motion to dismiss, an indictment must allege every essential element of a charged offense.  *See Jones v. United States*, 526 U.S. 227, 232 (1999); *Hamling v. United States*, 418 U.S. 87, 117 (1974).  Failure to allege an essential element renders the indictment defective.  *See United States v. Superior Growers Supply, Inc.*, 982 F.2d 173, 178 (6th Cir. 1992).

Likewise, "it is axiomatic that, to be legally sufficient, the indictment must assert facts which in law constitute an offense; and which, if proved, would establish prima facie the defendant's commission of that crime." *United States v. Landham*, 251 F.3d 1072, 1079 (6th Cir. 2001) (internal quotation marks and alteration omitted).  Stating bare legal conclusions is not enough; the indictment "must descend to particulars to inform the defendant of the facts alleged with reasonable particularity of time, place, and circumstances." *Coles v. Smith*, 577 F. App'x 502, 507 (6th Cir. 2014) (internal quotation marks omitted).  Though an indictment may rely on statutory language, it must also contain "such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged." *Hamling*, 418 U.S. at 117–18; *see also Russell v. United States*, 369 U.S. 749, 764 (1962).

Where the government fails to allege an essential element of an offense or fails to allege facts that constitute an offense, dismissal is "the proper result," *Landham*, 251 F.3d at 1080.  Indeed, it is the only remedy in these circumstances; neither a bill of particulars, nor information supplied in discovery, cures a legally deficient indictment.  *See Russell*, 369 U.S. at 770; *Superior Growers Supply*, 982 F.2d at 177; *United States v. Cecil*, 608 F.2d 1294, 1296 (9th Cir. 1979).

In considering whether to dismiss an indictment or particular counts, the court may consider extrinsic evidence where doing so is "necessary to decide the

questions of law presented . . . so long as the court's findings on the motion do not invade the province of the ultimate finder of fact." *United States v. Jones*, 542 F.2d 661, 664 (6th Cir. 1976); *see also United States v. Levin*, 973 F.2d 463, 470 (6th Cir. 1992). The court should dismiss the indictment where such "undisputed extrinsic evidence" shows that the government, as a matter of law, cannot prove an element of the charged offense. *Levin*, 973 F.3d at 470.

## ARGUMENT

The Court should dismiss Counts 2 through 13 and portions of Count 1. Counts 2 through 7 charge Mr. Palma with violations of the Clean Air Act based on alleged misstatements in FCA's certification applications. But the Indictment fails to allege that Mr. Palma prepared or was responsible for these applications; fails to allege that Mr. Palma willfully caused his employer to make the alleged misstatements, as the relevant statute requires; and fails to identify the purported misstatements in Counts 2, 3, and 7.

The wire fraud charges in Counts 8 through 11 fail because they do not allege a cognizable money or property interest as an object of the purported fraudulent scheme—a defect made clear by the Supreme Court's *Kelly* decision, which was handed down after the instant Indictment was returned. *See Kelly*, 140 S. Ct. at 1571. Moreover, three of the wire fraud counts do not charge a

communication made "in furtherance" of the alleged scheme, and thus fail for this reason as well.  *See United States v. Hartsel*, 199 F.3d 812, 816–17 (6th Cir. 1999).

Counts 12 and 13 charge Mr. Palma with making false statements during the August 3, 2016 interview.  But each count is "premised on a statement which on its face is not false."  *United States v. Gatewood*, 173 F.3d 983, 987 (6th Cir. 1999).  Based on the Indictment itself, the statements were "literally and factually correct," *id.* at 986, and thus, Counts 12 and 13 fail as a matter of law.

Finally, the wire fraud conspiracy charged in Count 1 fails for the same reason the substantive counts fail: The Indictment does not identify a property interest that could support a wire fraud scheme.  The portion of Count 1 alleging that Mr. Palma conspired to commit wire fraud should, therefore, also be dismissed.

## I.   COUNTS 2–7 FAIL TO ALLEGE FACTS THAT IN LAW CONSTITUTE AN OFFENSE.

Counts 2 through 7 charge Mr. Palma with violating the Clean Air Act's false statements provision, 42 U.S.C. § 7413(c)(2)(A), which prohibits "knowingly . . . mak[ing] any false material statement, representation, or certification in, or omit[ting] material information from," documents filed under the Clean Air Act.[5]  The asserted basis for each count is one of six documents that

---

[5] Although the Clean Air Act imposes punishment on a "person who knowingly" makes a false statement in an EPA submission, 42 U.S.C. § 7413(c)(2)(A), the Act excludes from the definition of "person" any "employee who is carrying out his (….continued)

FCA submitted to the EPA between December 2014 and March 2016 in support of its certification applications for the Subject Vehicles.  *See* Indictment ¶ 97.  The Clean Air Act counts should be dismissed for three independent reasons.

First, the Indictment fails to allege how Mr. Palma—a calibrator, employed by FCA's supplier, with no responsibility for vehicle certifications—"caused" FCA to submit regulatory disclosures.  *See id.* ¶¶ 87–91, 93.  The Indictment does not allege that Mr. Palma was responsible for these submissions; indeed, it concedes that FCA did not even employ Mr. Palma until June 2016, well after FCA had submitted all six of the documents.  *Id.* ¶¶ 4, 97.  Until that time, Mr. Palma worked for VM Motori, a supplier to FCA that eventually became its wholly owned subsidiary.  *Id.* ¶¶ 3–4.  As the Indictment also acknowledges, Mr. Palma "developed and calibrated diesel engines for use in FCA's vehicles."  *Id.* ¶ 4.  He was not part of FCA's Regulatory Affairs or Certification groups, about which the

---

(continued….)

normal activities and who is acting under orders from the employer," unless that employee's violation was both "knowing" *and* "willful," *id.* § 7413(h).  The heightened mens rea standard in Section 7413(h) serves as an affirmative defense, *United States v. Shurelds*, 173 F.3d 430 (Table), 1999 WL 137636, at *2 (6th Cir. Mar. 2, 1999).  If the court declines to dismiss Counts 2 through 7, the government must prove at trial that Mr. Palma—who fits squarely into the category of employees identified in Section 7413(h)—not only acted "knowingly," but also with a "bad purpose," that is, "with knowledge that his conduct was unlawful," *Bryan v. United States*, 524 U.S. 184, 191–92 (1998) (defining willfulness); *see also, e.g.*, *United States v. Dipentino*, 242 F.3d 1090, 1093 (9th Cir. 2001) (noting Section 7413(h)'s heightened willfulness standard).

Indictment is silent. And the six certification applications themselves[6] were authorized by employees in FCA's Regulatory Affairs group.[7] Mr. Palma's name appears nowhere in any of these documents. Without an allegation that Mr. Palma was responsible for these submissions, or some indication of how he "caused" FCA to make the alleged misstatements, the Court should dismiss the charges.

Second, the Indictment fails to allege that Mr. Palma willfully caused FCA to make the alleged false and misleading representations in its applications to regulators. Counts 2 through 7 hinge on 18 U.S.C. § 2, which requires that a defendant "willfully cause[]" the charged offense, *id.*; *see* Indictment ¶ 97 (invoking 18 U.S.C. § 2); *id.* ¶¶ 87–91, 93 (alleging only that Mr. Palma "caused FCA to submit" the certification applications). To convict a defendant, under 18 U.S.C. § 2, of causing another to make a false statement, the government must

---

[6] The government provided the six documents in discovery and confirmed that they are the submissions to which the Indictment refers. Pursuant to the parties' stipulated protective order, which the Court entered on October 23, 2019, these and certain other documents cited in this motion have been filed under seal. *See* ECF no. 20 at p. 5, ¶ 9. Mr. Palma contacted the government and counsel for FCA to determine whether they had an objection to filing these exhibits under seal, and he did not receive any objection.

[7] *See* Sealed Ex. 2 at 3 (Chrysler Grp. LLC 2014 Application for Certification) (listing eight such employees: Maureen M. Morgan, Rengin Usmen, Joseph P. Ryan, Jr., Paul E. Mendrick, Ellis Jefferson, Kelli Myers, Morrie Lee, and Jeffrey Stilman); Sealed Ex. 3 at 4 (FCA US LLC 2016MY Application for Certification) (listing same employees, minus Maureen M. Morgan, plus Jim Smith and Beth Borland); Sealed Ex. 7 at 3 (Chrysler Grp. LLC 2015MY Application for Certification) (listing same employees as Sealed Ex. 2).

establish that the defendant acted "voluntarily and intentionally and with the specific intent to do something which the law forbids . . . that is to say, with bad purpose either to disobey or disregard the law." *United States v. Brown*, 151 F.3d 476, 486 (6th Cir. 1998). In *Brown*, the Sixth Circuit reversed a defendant's convictions, which were predicated on 18 U.S.C. § 2 and 18 U.S.C. § 1001, where the defendant had no job training or responsibility for a certain procedure that was the basis of her false statement charges. *See id.* at 487. Here, likewise, Mr. Palma had no job training or responsibility for FCA's regulatory-disclosure obligations. The government has alleged that Mr. Palma "knowingly" caused FCA to violate the Clean Air Act, Indictment ¶ 97. But it does not—and cannot—allege that he "willfully participate[d] in the commission of a crime," as 18 U.S.C. § 2 requires, *see Brown*, 151 F.3d at 486. As a matter of law, therefore, Counts 2 through 7 fail to state an offense for this reason as well.

Third, the Indictment does not identify the alleged false statements or omissions on which Counts 2, 3, and 7 are premised.[8] These counts are based on FCA's 2014, 2015, and 2016 certification applications, whereas Counts 4 through

---

[8] The Indictment provides slightly more information about the purported misstatements underlying Counts 4, 5, and 6, and Mr. Palma therefore does not move to dismiss those counts on this basis. Because the Indictment's general description of these counts could refer to a number of different statements in the voluminous submissions, however, Mr. Palma requests a bill of particulars with respect to these counts, as set forth in the accompanying motion.

6 are based on the AECD lists that accompanied each application.  *See* Indictment ¶ 97.  The government identifies only a single statement that could support Counts 2, 3, and 7—a lengthy excerpt, quoted in ¶ 22 of the Indictment, which appears in each of the underlying applications—but does not allege that this statement is false. Nor does the government identify any other statement that could serve as one of the allegedly "false and misleading representations" in the applications for certification.  *Id.* ¶ 42.

Such an omission is especially prejudicial given the nature of the documents in question.  At 53 pages (Count 2), 149 pages (Count 3), and 154 pages (Count 7) in length, the documents contain detailed analysis of complex engineering concepts. *See* Sealed Ex. 2 (Count 2); Sealed Ex. 3 (Count 3); Sealed Ex. 7 (Count 7).  As another district court concluded when facing analogous facts in *United States v. Winchester*, 407 F. Supp. 261 (D. Del. 1975), dismissal is appropriate in such circumstances, *id.* at 275–76 (dismissing false statement counts where government failed to identify allegedly false statements in government submissions).  Here, as in *Winchester*, a bill of particulars "would not constitute a legally proper substitute for a definite statement concerning what the grand jury had charged."  *Id.* at 276. For this reason as well, Counts 2, 3, and 7 should be dismissed.[9]

---

[9] Although Mr. Palma has also asked for a bill of particulars with respect to Counts 2, 3, and 7, he believes the appropriate remedy is dismissal.  At the very

(….continued)

## II.    COUNTS 8–11 FAIL TO ALLEGE FACTS THAT CONSTITUTE WIRE FRAUD.

Counts 8 through 11 charge Mr. Palma with violating the wire fraud statute, 18 U.S.C. § 1343.  A wire fraud charge requires the government to prove (1) "that the defendant devised or willfully participated in a scheme to defraud"; (2) "that he used or caused to be used an interstate wire communication in furtherance of the scheme"; and (3) "that he intended to deprive a victim of money or property." *United States v. Cunningham*, 679 F.3d 355, 370 (6th Cir. 2012).  Wire fraud charges must allege facts "with such reasonable particularity . . . as will . . . apprise [the defendant], with reasonable certainty, of the nature of the accusation." *United States v. Steffen*, 687 F.3d 1104, 1113 (8th Cir. 2012) (alteration in original) (internal quotation marks omitted).

The wire fraud charges against Mr. Palma are based on four emails involving communications among Mr. Palma and colleagues at VM Motori, FCA, and Arnold & Porter.  Those emails, attached for the Court's reference, are:

- *Count 8*: An October 1, 2014 email in which Mr. Palma forwarded to his VM Motori colleagues a short set of answers that FCA had provided to regulators regarding the valve train cleaning routine.  *See* Indictment

(continued….)

least, however, a bill of particulars is necessary to provide Mr. Palma the information necessary to prepare his defense for trial. *See United States v. Trie*, 21 F. Supp. 2d 7, 21 (D.D.C. 1998) ("A defendant faced with false statements charges should not have to waste precious pre-trial preparation time guessing which statements he has to defend against . . . .").

¶ 102; Sealed Ex. 8 at 1.  The recipients of Mr. Palma's forwarded email were his superiors, Luca Sabbioni and Sergio Pasini, as well as five other colleagues: Michele Padovan, Matt Lipkowitz, Spencer Schipper, Luigi Martella, and Alessandro Mazza.

- *Count 9:* An October 3, 2014 email from Mr. Palma to Sergio Pasini, his supervisor at VM Motori, explaining why CARB would not be interested in seeing the original documentation in which FCA had approved the valve train cleaning routine.  *See* Indictment ¶ 102; Sealed Ex. 9 at 1.

- *Count 10*:  A December 1, 2015 email from Morrie Lee, who was a manager in FCA's Regulatory Affairs group, to individuals from the EPA and CARB, as well as his colleague in Regulatory Affairs, Steve Mazure, with a set of answers to certain questions regulators asked about the Subject Vehicles.  *See* Indictment ¶ 102; Sealed Ex. 10 at 1.

- *Count 11*:  A June 24, 2016 email from Mr. Palma to Zachary Fayne and Thomas Santoro, two lawyers at FCA's outside counsel, Arnold & Porter, that included a preliminary draft version of the PowerPoint presentation that Arnold & Porter would deliver at the June 29, 2016 meeting with regulators.  *See* Indictment ¶ 102; Sealed Ex. 11 at 1.

The wire fraud counts present two infirmities: The government fails to allege a cognizable money or property interest as an object of the alleged scheme, and three of the counts are based on communications that were not "in furtherance" of that alleged scheme.  Counts 8 through 11 thus fail as a matter of law.

### A.    Counts 8–11 Fail To Allege a Cognizable Property Interest.

As the Supreme Court reaffirmed this Term in *Kelly*, the wire fraud statute "prohibits only deceptive schemes to deprive [the victim of] money or property." 140 S. Ct. at 1571 (alteration in original) (internal quotation marks omitted).  More is required than intentional misstatements or omissions: "Lightly equating

deceptions with property deprivation" does not support a wire fraud conviction.

*United States v. Sadler*, 750 F.3d 585, 591 (6th Cir. 2014); *see also Kelly*, 140 S.

Ct. at 1568.

Here, the Indictment does not specify what property Mr. Palma allegedly

sought.  Although the Indictment suggests two potential "victims" of the scheme—

the government and FCA's customers—neither supports a wire fraud charge.[10]

### i.   Regulators

The Indictment alleges that one of the scheme's purposes was to "make and

cause others to make false and misleading representations to FCA's Regulators in

order to obtain regulatory approval to sell the Subject Vehicles."  Indictment ¶ 33;

*see also id.* ¶¶ 40, 64.  But the law is clear that regulatory approval—here,

certificates of conformity from the EPA and executive orders from CARB—cannot

constitute the relevant "property" under the wire fraud statute.

In *Cleveland v. United States*, 531 U.S. 12 (2000), the Supreme Court

considered whether "a government regulator parts with 'property' when it issues a

license"—specifically, a gambling license, *id.* at 20.  The Court concluded that

"such a license is not 'property' in the government regulator's hands" for purposes

of the mail fraud statute, *id.*, because the license implicated the government's

---

[10] The Indictment also refers to misstatements made to "the public," ¶ 33, but
fails to allege how any such misstatements are distinct from those purportedly
made to FCA's customers.

power as a regulator, not as a property holder, *id.* at 23–24.  In *Kelly*, the Supreme

Court relied on and expanded this reasoning when it unanimously reversed wire

fraud convictions premised on the closure of traffic lanes under false pretenses.

*See* 140 S. Ct. at 1574.  The Court reiterated that a government license "implicate[s]

the Government's role as sovereign"—specifically, its "power to regulate," and

"not its role 'as property holder.'"  *Id.* at 1572 (quoting *Cleveland*, 531 U.S. at 23–

24).  The Court analogized defendants' conduct—"alter[ing] a regulatory decision

about the toll plaza's use"—to a decision "about which drivers had a 'license' to

use which lanes," and concluded that "under *Cleveland*, that run-of-the-mine

exercise of regulatory power cannot count as the taking of property."  140 S. Ct. at

1573; *see also id.* at 1572 (citing *Cleveland*, 531 U.S. at 23).

Multiple Circuits have reversed mail and wire fraud convictions in the

licensing context.  *See, e.g.*, *United States v. Murphy*, 836 F.2d 248, 253–54 (6th

Cir. 1988) (state government has no property interest in charity bingo licenses);

*United States v. Schwartz*, 924 F.2d 410, 418 (2d Cir. 1991) (State Department's

issuance of arms export licenses is not property, for purposes of wire fraud statute,

because it derives from government's power to regulate); *Toulabi v. United States*,

875 F.2d 122, 125–26 (7th Cir. 1989) (city government has no property interest in

taxi licensing scheme); *United States v. Kato*, 878 F.2d 267, 269 (9th Cir. 1989)

(scheme to defraud Federal Aviation Administration into issuing private pilot

certificates to those unqualified did not affect government's interest as a property holder, as required to support a mail fraud conviction).

Here, regulators' certificates of conformity and executive orders allowed FCA to sell diesel vehicles in the United States. Like arms export licenses, pilot licenses, and gambling licenses, licenses to sell vehicles represent the EPA's and CARB's powers to regulate. Thus, the government cannot sustain a wire fraud charge by casting EPA and CARB as victims: certificates of conformity and executive orders do not, as a matter of law, constitute property interests.

### ii. FCA's Customers

The Indictment also alleges that Mr. Palma made, and "cause[d] others to make false and misleading representations to FCA's customers and the public in an effort to increase sales and promote the Subject Vehicles." Indictment ¶ 33; *see also id.* ¶ 68. But any theory that relies on an alleged deprivation of money from customers also fails as a matter of law.

The Indictment does not, and cannot, allege that Mr. Palma had any control over how the Subject Vehicles were marketed. During the relevant period, Mr. Palma worked as a calibration engineer at a supplier to FCA, *see id.* ¶¶ 3–4; he had nothing to do with how FCA, his multinational corporate customer, marketed its vehicles. The wire communications charged in Counts 8 through 11 are instructive in this regard. Each communication deals with calibration strategies; not one

involves a communication to customers.  In fact, the Indictment does not name a single act Mr. Palma took with respect to the Subject Vehicles' marketing.

The Indictment similarly fails to allege how Mr. Palma sought to obtain customers' money.  All the Indictment can muster is a vague assertion that Mr. Palma and his purported co-conspirators sought to "enrich themselves through the continued receipt of compensation and other benefits."  Indictment ¶ 33.  But there is no allegation that Mr. Palma's compensation varied depending on the amount of sales, just as there is no indication what the alleged "other benefits" might entail.

At bottom, a wire fraud theory predicated on customer harm simply repackages the deficient government-license-as-property theory.  Alleging that customers were defrauded because they purchased vehicles that regulators had approved based on incomplete information is a dressed-up version of the government's first theory, in which government licenses constitute the relevant "property."  Under *Kelly* and its precursors, the customer-harm theory should fail as a matter of law.  Otherwise, the government could evade the holdings of cases cited in the previous section through formalistic—but meaningless—modifications. Defendants who, for example, do not commit mail or wire fraud by defrauding regulators out of taxi or pilot licenses, *see Toulabi*, 875 F.2d at 125–26; *Kato*, 878 F.2d at 269, could be convicted—on identical facts—for defrauding customers out

of the right to have a properly licensed taxi driver or pilot.  The government cannot bypass the case law with an arbitrary tweak of its theory.

In light of the expansive statutory language, it is possible for the government to "stretch the reach of the mail and wire fraud statutes far beyond where they should go."  *United States v. Weimert*, 819 F.3d 351, 355 (7th Cir. 2016).  Counts 8 through 11 are examples of that overreach.  The government is charging an engineer who had no involvement in marketing strategy with committing wire fraud against customers.  This theory is unsupported on the face of the Indictment and under the law.  But the consequences of that overreach are real: The wire fraud charges expose Mr. Palma to a potential twenty-year statutory maximum term of incarceration on each count, rather than the five- or two-year maximum that other charges bring.  Because the Indictment does not, and the government cannot, allege a cognizable wire fraud theory, the Court should dismiss Counts 8 through 11.

### B.   The Communications Charged in Counts 8, 9, and 11 Were Not Made "In Furtherance" of the Alleged Scheme.

Apart from the Indictment's failure to allege a cognizable property interest in support of wire fraud, three of the four counts fail to allege a communication "in furtherance" of the alleged fraudulent scheme and fail as a matter of law for this reason as well.  *See United States v. Hartsel*, 199 F.3d 812, 816 (6th Cir. 1999).

A communication is not "in furtherance" of a fraudulent scheme where it is immaterial to the scheme's success.  *See, e.g.*, *United States v. Maze*, 414 U.S. 395,

402 (1974) (affirming reversal of mail fraud conviction where there was "no indication that the success of [defendant's] scheme depended in any way on" the charged mailings); *Parr v. United States*, 363 U.S. 370, 393 (1960) (reversing mail fraud convictions where underlying communications were "immaterial" to "any consummation of the scheme"). The "relevant question at all times is whether" the communication "is part of the execution of the scheme as conceived by the perpetrator at the time," *Schmuck v. United States*, 489 U.S. 705, 715 (1989).

The Sixth Circuit has rejected mail fraud charges where, as here, the underlying communications were immaterial to the success of the alleged scheme.[11] In *United States v. Hartsel*, for example, the defendant was convicted of mail fraud based on monthly bank statements for an account from which he embezzled funds. 199 F.3d at 814–15. Reversing this conviction, the Sixth Circuit observed that "the bank statements [must be] used in some way to aid or further the scheme before the mailing requirement is satisfied." *Id.* at 818. Though the account was essential to the defendant's scheme, and the mailings were incident to that account, "such a determination [did] not necessarily mandate the ultimate conclusion that the bank statements were used to aid or further the scheme." *Id.* The outcome in *Hartsel* is not uncommon: The "in furtherance" requirement has

_____

[11] The analysis under the mail fraud statute is identical to that under the wire fraud statute. *See, e.g.*, *Carpenter v. United States*, 484 U.S. 19, 25 n.6 (1987).

repeatedly doomed mail fraud charges in the Sixth Circuit. *See, e.g.*, *United States v. Frost*, 125 F.3d 346, 358–59 (6th Cir. 1997); *United States v. Keene*, 959 F.2d 237 (Table), 1992 WL 68285, at *2 (6th Cir. Apr. 6, 1992); *United States v. Castile*, 795 F.2d 1273, 1281 (6th Cir. 1986).

The emails charged in Counts 8, 9, and 11, like the communications deemed immaterial in *Castile*, *Keene*, *Frost*, and *Hartsel*, could not have advanced the alleged fraudulent scheme and should be dismissed. Where, as here, "the indictment fails to set forth facts showing that the [charged communication] . . . furthered the fraudulent scheme alleged," dismissal of the wire fraud counts is the appropriate remedy. *See United States v. Smith*, No. 3:08-cr-31-JMH, 2011 WL 2417051, at *3 (E.D. Ky. June 13, 2011).

### i. Count 8

Under no interpretation did the charged communication in Count 8 "aid or further" the alleged scheme. *See Hartsel*, 199 F.3d at 818. There, Mr. Palma forwards to his colleagues information provided to CARB earlier that day, writing:

> This message closes the first round of questions around this topic, we should get the [executive order] either Friday or Monday. This doesn't mean the topic is closed, I expect more questions and probably another call in the coming days.
>
> Waiting for the "big one" in California…

*See* Sealed Ex. 8 at 1 (Email from Emanuele Palma to Luca Sabbioni, Sergio Pasini, et al. (Oct. 1, 2014, 5:49 PM)); Indictment ¶¶ 85, 102. The forwarded

email was from an FCA engineer (Dan Hennessy) to two members of FCA's

Regulatory Affairs group (Steve Mazure and Ellis Jefferson) with information

provided to CARB about the valve train cleaning routine.  Sealed Ex. 8 at 1.

The purported fraudulent scheme is that Mr. Palma allegedly lied to

regulators and customers.  But the communication charged in Count 8 is an email

in which Mr. Palma forwards answers already given to regulators.  Even under the

government's theory, which assumes that the information provided to CARB

contained misstatements, Mr. Palma could not have furthered the alleged scheme

by forwarding these answers to his colleagues after the fact.  *See Kann v. United

States*, 323 U.S. 88, 94 (1944) (to support mail fraud charge, communication must

be "used prior to, and as one step toward, the receipt of the fruits of the fraud").

The charged wire likewise could not have "served any useful step, purpose, or role

in furthering the [alleged] scheme," *see Hartsel*, 199 F.3d at 818.

### ii.   Count 9

Count 9 should be dismissed for the same reasons as Count 8.  The charged

communication appears at the end of a long email thread regarding FCA's

application for a Model Year 2015 executive order from CARB.  Mr. Palma

appears nowhere on the first three pages of chronologically ordered messages (of

four total).  The bulk of the thread contains a discussion among high-ranking

members of FCA's leadership and Regulatory Affairs groups; the topic was the

valve train cleaning routine, specifically in connection with an information request from CARB. *See* Sealed Ex. 9 at 1–2 (Email from Emanuele Palma to Sergio Pasini (Oct. 3, 2014, 6:19 AM), following thread among Larry Nowak, Bob Lee, et al.). Larry Nowak, FCA's platform manager for diesel engines, forwarded the thread to Mr. Palma and Mr. Palma's supervisor at VM Motori (Sergio Pasini), among others, and wrote: "FYI, this is the update that I provided Bob Lee this evening on our AECD rejection. We need to better describe the conditions under which EGR is shut off and have test data showing the emissions impact of the EGR shut off."[12] *Id.* at 1. In response, Mr. Pasini suggested locating the documentation in which VM Motori had explained—and FCA had authorized—the valve train cleaning routine. *Id.* Mr. Palma responds, in Italian, that CARB does not care about FCA's approval, before observing: "it's not that you can drive around Los Angeles with a closed egr because you have a weak valvetrain! Especially if you don't even know how much more you're polluting." *Id.* That is, Mr. Palma was explaining that CARB would not be interested in whether FCA had given approval for VM Motori, its supplier, to use the valve train cleaning routine in the Subject Vehicles; the only relevant consideration was the strategy's emissions impact.

---

[12] Bob Lee was the global head of Powertrain for FCA, and one of the company's highest-level executives.

As with Count 8, the charged communication in Count 9 could not have "served any useful step, purpose, or role in furthering the [alleged] scheme." *See Hartsel*, 199 F.3d at 818. Here, as in *Hartsel*, the charged communication did not deceive the authorities, conceal misconduct, or otherwise facilitate the alleged scheme. Even if one accepted the government's characterization of the email— that Mr. Palma was "describing the valve train cleaning routine," *see* Indictment ¶ 102—it is clear on the face of the document that such a routine communication could not have furthered an alleged fraudulent scheme. Because the charged communication in Count 9 was not in furtherance of the alleged scheme, this count fails as a matter of law.

### iii. Count 11

Count 11 suffers from the same defect as Counts 8 and 9. The communication charged in Count 11 is an email from Mr. Palma to two lawyers at Arnold & Porter, attaching revisions to the PowerPoint presentation that Arnold & Porter had prepared for the upcoming June 29, 2016 meeting with regulators. *See* Sealed Ex. 11 at 1 (Email from Emanuele Palma to Zachary Fayne and Thomas Santoro (June 24, 2016, 12:02 PM)). The Indictment alleges that, during the June 29 meeting, "numerous false and misleading representations which were contained within the PowerPoint Presentation were given to FCA's Regulators," and that Mr. Palma had "assisted in the preparation" of the presentation, "including by drafting

specific slides." Indictment ¶ 71.  But the Indictment avoids alleging that Mr. Palma himself authored the allegedly misleading statements, or that FCA's lawyers, either in its General Counsel's office or at Arnold & Porter, were co-conspirators. FCA's lawyers at Arnold & Porter—not Mr. Palma—were responsible for the representations made to regulators.  And, as the defense understands, the purported misstatements were not contained in the slides Mr. Palma drafted.  Because the Indictment fails to allege that Mr. Palma prepared these statements, or that any of the lawyers involved in the communication were co-conspirators, this email was not "necessary to the success" of the alleged scheme, or otherwise in furtherance of it.  *See Hartsel*, 199 F.3d at 816–17.  Count 11 therefore fails to state an offense.

## III.   COUNTS 12 AND 13 FAIL TO ALLEGE ESSENTIAL ELEMENTS OF A SECTION 1001 VIOLATION.

Counts 12 and 13 charge Mr. Palma with making false statements in violation of 18 U.S.C. § 1001(a).  *See* Indictment ¶ 104.  These charges stem from the interview conducted by two federal agents at Mr. Palma's home on the evening of August 3, 2016.  *See id.*  The attached draft transcript of the interview, provided to the defense by the government,[13] reveals that Mr. Palma was sleeping on his

---

[13] While Mr. Palma cites to the transcript for purposes of this motion, he does not stipulate to its accuracy.  In one key discrepancy, for instance, in the recording agents seemingly attempt to reassure Mr. Palma that he will not be punished for failing to remember the details of meetings and discussions from long ago: "And we're not, we're not . . . *this isn't like a, I'm holding it* [mumbles] . . . I don't mean
(....continued)

couch when the agents rang his doorbell—a fact the agents observed while peering through his window—since he had recently returned from a two-week trip to Italy. *See* Sealed Ex. 12 at 1 (VD: "Is he looking out the door?"  GR: "He's laying on the couch."); *id.* at 1, 25 (stating that his family was still in Italy and, later, that he was "still in" Italian time).  Over the course of one hour and forty-five minutes, the agents asked Mr. Palma technical questions about the calibration of the Subject Vehicles and his understanding of emissions regulations and standards.[14]  The transcript makes clear that the agents had a poor command of the subject matter, asking Mr. Palma at one point to describe sophisticated calibration issues as though he were speaking to a child.  *See id.* at 6.  As noted, government regulators had already received a detailed presentation regarding the calibration strategies in the Subject Vehicles just a month prior, at the June 29, 2016 meeting with FCA's outside counsel, Arnold & Porter.

---

(continued….)

to . . . yeah."  But in the corresponding transcript page, the agent's reassurances are missing: "And we're not, this isn't like a . . . I don't mean to . . . So we appreciate that and we're just asking you what you remember.  And we also recognize it was 4-5 years ago."  Sealed Ex. 12 (Transcript of Aug. 3, 2016 Interview with Emanuele Palma (Case No. 0506-0093)) at 22 (ellipses in original).  In one other instance, agents assured Mr. Palma that a detail in his answer was "not something we're gonna hold you to."  *Id.* at 3.

[14] Mr. Palma did not have a lawyer present, nor was he informed of his right to legal counsel.  When Mr. Palma asked whether he should have a lawyer present, the agents responded only by saying that "we deal with lots of lawyers," and continued the questioning.  Sealed Ex. 12 at 15.

To state an offense under the relevant provision of Section 1001(a), the government must allege a statement that is false "on its face."[15] *United States v. Gatewood*, 173 F.3d 983, 987 (6th Cir. 1999).  A false statement prosecution under Section 1001 "cannot be based on an ambiguous question where the response *may* be literally and factually correct." *Id.* at 986.  In *Gatewood*, the defendant submitted an invoice to the Navy with a signed certification stating that "to the best of [his] knowledge and belief, . . . [p]ayments to [his] subcontractors and suppliers ha[d] been made from previous payments received under the contract." *Id.* at 984–85 (alteration in original).  In a superseding indictment, the government charged the defendant under Section 1001, alleging that although he certified having made payments to his subcontractors and suppliers, he "well knew he had not made full

---

[15] Counts 12 and 13 of the Indictment quote statutory language from both 18 U.S.C. § 1001(a)(1) and (a)(2). *See* Indictment ¶ 104.  The government's factual allegations, however, only contemplate an alleged violation of Section 1001(a)(2), which proscribes knowingly and willfully "mak[ing] any materially false, fictitious, or fraudulent statement[s] or representation[s]" in a matter within the jurisdiction of the federal government.  The charged statements in Counts 12 and 13 can only be construed as alleged false statements under Section 1001(a)(2)—not as a "trick, scheme, or device" under Section 1001(a)(1).

If the government does in fact intend to prosecute the charged statements under Section 1001(a)(1), Counts 12 and 13 fail for a different reason.  To state an offense under Section 1001(a)(1), the government must allege that "the defendant had a duty to disclose material information," *United States v. Craig*, 401 F. Supp. 3d 49, 62–63 (D.D.C. 2019).  Because the Indictment fails to allege this essential element, Counts 12 and 13 are legally deficient to the extent they are predicated on Section 1001(a)(1).

payments" to them.  *Id.* at 985.  On appeal, the Sixth Circuit concluded that the indictment "present[ed] a false dichotomy, because certifying that one has made payments to subcontractors is not inconsistent with having yet to pay the subcontractors in full."  *Id.* at 987.  Because the indictment was "premised on a statement which on its face [was] not false," the court held that the indictment failed to allege an offense and was therefore fatally defective.  *Id.*

   *Gatewood* is not an outlier: The Sixth Circuit has reversed other convictions under Section 1001 where the defendant's alleged false statement "was, on its face, not a false representation."  *United States v. Hixon*, 987 F.2d 1261, 1266, 1267 (6th Cir. 1993) (defendant's representation that he was not self-employed did not constitute a false statement, because he was technically employed by a corporation—"a distinct legal entity"—of which he was the sole owner and employee); *United States v. Gahagan*, 881 F.2d 1380, 1383 (6th Cir. 1989) (defendant's representation that he did not own a vehicle was not a false statement, because he had transferred title before making the representation).

## A.    Count 12

   Like the charge in *Gatewood*, Count 12 is premised on a statement that is not false "on its face."  Count 12 charges Mr. Palma with falsely stating that "one of the reasons" T_Eng was introduced "was to contain soot emissions and resolve 'engine shudder.'"  Indictment ¶ 104.  The attached draft transcript illustrates that

the charged statement arose from the following exchange, in which the agents

explicitly asked Mr. Palma to simplify a complex engineering topic:

> Agent 1:    First of all, I'm not an engineer, so talk to me like you're
> explaining to your kid what you do at work.
>
> Agent 2:    Yeah, or your neighbor.  Your kid might not get it, but yeah.
>
> Agent 1:    What does daddy do?  And what is this T_ENG function?
>
> Agent 2:    And when we say genesis, I guess, what was the origin, like
> how does it come about?  Why was it first introduced?
>
> Palma:      Why it was introduced?  The reasons why it was introduced
> were multiple.  On the one hand, there was a need to . . . one of
> the problems with this engine that we had when we were
> developing the calibrations for this engine was . . . soot
> emissions and a problem that we called engine shudder.

Sealed Ex. 12 at 6 (ellipses in original).  It is clear from the Indictment that Mr.

Palma's answer—T_Eng was introduced in part to address soot and engine

shudder—was a true statement.  As the government explains, Mr. Palma and his

colleagues noticed that "an accumulation of soot deposits" on the Subject Vehicles'

valve stems generated "engine shudder" that "caused the vehicles to noticeably

shake."  Indictment ¶ 61.  Reducing the EGR rate—precisely what T_Eng did—

"corrected the shudder problem."  *Id.*  Based on the government's own allegations,

Mr. Palma's answer was "literally and factually correct," *Gatewood*, 173 F.3d at

986, and Count 12 therefore fails as a matter of law.

### B.    Count 13

The same analysis shows that the statement charged in Count 13 was also

"literally and factually correct," *see id.*  Mr. Palma made the statement referenced

in that count, italicized below, in response to a question he was asked about the

T_Eng function, to which he responded:

> "[A]t the end of the day, this calibration works the same all the time, so doing an FTP75 [a certain federal test procedure cycle] in the lab, doing an FTP75 on the road, doing two FTP75s one after another, this calibration was, this calibration would always work. . . . *So there was never an attempt to calibrate in way* [sic] *that there is a cycle recognition and when the cycle is over, well, there is no longer an emissions control*."

Sealed Ex. 12 at 14; *see* Indictment ¶ 104.  The transcript shows that Mr. Palma

was using the term "cycle recognition" to mean that "when the cycle is over . . .

there is no longer an emissions control."  That statement is true: It was <u>not</u> the case

that when the test cycle was over there were no longer emission controls.  Stated

differently, <u>some</u> emission controls remained in place when the test cycle was over.

Even the Indictment alleges that, in off-cycle conditions, the T_Eng function

merely resulted in a "lower [] EGR rate," *id.* ¶ 37, and that online dosing "reduced

the DEF dosing rate" used in the SCR, another component of the emissions system,

*id.* ¶ 39.  Accepting the facts alleged on the face of the Indictment as true, the

charged statement—that "there was never an attempt to calibrate the Subject

Vehicles in a way that there was 'cycle recognition' and when the 'cycle' is over

there were no longer emissions controls," *id.* ¶ 104—is "literally and factually

correct."  Because Mr. Palma's statement cannot support a Section 1001

prosecution, Count 13 should also be dismissed.

## IV.   THE CONSPIRACY TO COMMIT WIRE FRAUD CHARGED IN COUNT 1 SHOULD BE DISMISSED.

Finally, the Court should dismiss the third object of Count 1, which charges

a conspiracy to commit wire fraud.  The wire fraud conspiracy fails for the same

reason the substantive wire fraud counts fail: The Indictment does not allege a

cognizable property interest that could support a wire fraud charge.

To establish a conspiracy to commit wire fraud, the government must prove

that the defendant and at least one other person agreed to commit the elements of

wire fraud.  *See United States v. Rogers*, 769 F.3d 372, 377 (6th Cir. 2014).

Although a conspiracy to commit wire fraud is a different offense from a

substantive violation of the wire fraud statute, where there is no legally cognizable

scheme to defraud, both the substantive offense and the conspiracy count should be

dismissed.  *See Kelly*, 140 S. Ct. at 1571 n.1 (reversing wire fraud conspiracy

convictions where purported scheme did not aim to obtain money or property,

adding: "If there was property fraud here, there was also conspiracy to commit it.

But if not, not"); *United States v. Bobo*, 344 F.3d 1076, 1086 (11th Cir. 2003)

("Where the scheme to defraud alleged in the substantive count is not sufficient to

state an offense, a conspiracy count based upon the charge must also be found

deficient."); *United States v. Manarite*, 44 F.3d 1407, 1414 (9th Cir. 1995)

(reversing conspiracy convictions where substantive mail and wire fraud objects "were legally insufficient to be federal offenses").

For the reasons explained *supra* Part II, the Indictment fails to allege a scheme to defraud. FCA's regulators cannot be the "victims" of the purported scheme, because government licenses do not constitute "property" for purposes of a fraudulent scheme. *Kelly*, 140 S. Ct. at 1572–73. Nor is it viable to argue that the scheme was predicated on alleged misrepresentations to customers. Tellingly, none of the 18 overt acts alleged in the Indictment involve a communication to customers, or even a communication to someone responsible for communicating with customers—just as none of the four charged wires involve a customer communication. *See* Indictment ¶¶ 77–95. Because the Indictment fails to allege a conspiracy to commit wire fraud, the third object of Count 1 should be dismissed.

## <u>CONCLUSION</u>

For the reasons set forth above, Counts 2 through 13 of the Indictment should be dismissed, and the Court should dismiss the third object of Count 1.

DATED: July 8, 2020

Respectfully submitted,

/s/ Greg D. Andres
GREG D. ANDRES
(NY Bar No. 2845568)
NEIL H. MACBRIDE
(DC Bar No. 439137 )
PAUL J. NATHANSON
(DC Bar No. 982269)
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
(212) 450-4000
greg.andres@davispolk.com

/s/ Kenneth M. Mogill
KENNETH M. MOGILL
(MI Bar No. P17865)
Mogill, Posner & Cohen
27 East Flint, 2nd Fl.
Lake Orion, MI 48362
(248) 814-9470
kmogill@bignet.net

Attorneys for Emanuele Palma