UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,                        Case No. 19-20626

v.                                       Honorable Nancy G. Edmunds

EMANUELE PALMA,

                Defendant.

_____/

**CORRECTED OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS [33]; DENYING DEFENDANT'S MOTION FOR A BILL OF PARTICULARS [34]; GRANTING DEFENDANT'S MOTION FOR DISCOVERY [35]; AND GRANTING IN PART DEFENDANT'S MOTION TO STRIKE SURPLUSAGE [36]**

Defendant Emanuele Palma has been charged in a 38-page indictment with thirteen counts: one count of conspiracy to defraud the United States, violate the Clean Air Act, and commit wire fraud in violation of 18 U.S.C. § 371 (Count 1); six counts of violations of the Clean Air Act under 42 U.S.C. § 7413(c)(2)(A) (Counts 2-7); four counts of wire fraud in violation of 18 U.S.C. § 1343 (Counts 8-11); and two counts of making false statements in violation of 18 U.S.C. § 1001(a) (Counts 12-13).  (ECF No. 1.)  Trial is currently scheduled in this matter for April 2021.

The matter is before the Court on four motions filed by Defendant: motion to dismiss Counts 2-13 and to dismiss in part Count 1 (ECF No. 33); motion for a bill of particulars (ECF No. 34); motion for discovery pursuant to Rule 16 and *Brady* (ECF No. 35); and motion to strike paragraph 41 of the indictment as surplusage (ECF No. 36). The government opposes the motions, (ECF Nos. 43, 44, 45, 46), and Defendant has filed a reply in support of each motion, (ECF Nos. 50, 51, 52, 53).  The Court held a

hearing on September 22, 2020.  For the reasons set forth below, the Court GRANTS

IN PART and DENIES IN PART Defendant's motion to dismiss, DENIES Defendant's

motion for a bill of particulars, GRANTS Defendant's motion for discovery, and

GRANTS IN PART Defendant's motion to strike surplusage.

## I.    Background

In 2007, Defendant, an engineer who specializes in the calibration of diesel

vehicle engines, began working for VM Motori, an Italian engine manufacturer which

supplied diesel engines to automobile manufacturers around the work, including to Fiat

Chrysler Automobiles ("FCA").  In 2012, Defendant moved to the Michigan office of VM

Motori's North American affiliate to work directly with FCA to develop and calibrate a

new diesel engine, which was used in the Model Year 2014-2016 versions of FCA's

Jeep Grand Cherokee and Ram 1500 vehicles (the "Subject Vehicles").  VM Motori

became a wholly owned FCA subsidiary in 2013.  Defendant remained a VM Motori

employee throughout the development of the Subject Vehicles and became a FCA

employee in June 2016.

Under the Clean Air Act, automakers must apply for and receive a certificate of

conformity from the U.S. Environmental Protection Agency ("EPA") for each model year

of vehicle they wish to sell, which confirms that the vehicle complies with the relevant

regulations, including emissions standards.  To sell vehicles in the state of California,

automakers must also satisfy standards established by the California Air Resources

Board ("CARB"), which issues its own compliance certificate called an executive order.

Beginning in 2013, FCA sought, and ultimately received, the certificates of

conformity and executive orders necessary to sell the Subject Vehicles.  Defendant

notes that at the time, he was not a FCA employee but worked with members of FCA's Regulatory Affairs and Certificate groups throughout the process.  He avers the Certification group decided whether calibration strategies were permissible, and the Regulatory Affairs group interacted with regulators, prepared certification applications, and reviewed and submitted the final applications.

In September 2015, the EPA informed FCA that it would perform additional emissions testing on FCA's vehicles.  In June 2016, FCA representatives met with officials from the EPA, CARB, and Department of Justice to discuss regulators' concerns.  Outside counsel delivered a PowerPoint presentation during that meeting. Approximately one month later, after Defendant returned from visiting family in Italy, two federal agents—one from the FBI and one from the EPA—came to Defendant's home and questioned him for more than ninety minutes.

Three years later, the government indicted and arrested Defendant.  The indictment alleges that Defendant participated in a conspiracy to mislead regulators, customers, and "the public" about the emissions control system in the Subject Vehicles. More specifically, Defendant and his co-conspirators are alleged to have fraudulently calibrated the emissions control systems on certain FCA diesel vehicles to produce lower nitrogen oxide ("NOx") emissions under conditions when the vehicles would be undergoing testing on the federal test procedures (or driving "cycles") and higher NOx emissions under conditions when the vehicles would be driven in the real world and not subjected to testing.  NOx is a regulated pollutant that is emitted when diesel fuels are burned.  The indictment further alleges that Defendant and his co-conspirators made numerous misrepresentations in order to accomplish their unlawful scheme.

The indictment alleges that the purpose of the scheme was for Defendant and his co-conspirators to (a) make and cause others to make false and misleading representations to FCA's Regulators in order to obtain regulatory approval to sell the Subject Vehicles in the United States; (b) make and cause others to make false and misleading representations to FCA's customers and the public in an effort to increase sales and promote the Subject Vehicles; and (c) enrich themselves through the continued receipt of compensation and other benefits.

## II.      Defendant's Motion to Dismiss Counts 2-13 and to Dismiss in Part Count 1

### A.      Legal Standard

Federal Rule of Criminal Procedure 7(c)(1) requires that an indictment be a plain written statement of the essential facts constituting the offense charged.  An indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and second, enables the defendant to plead an acquittal or conviction in bar of future prosecutions for the same offense.  *Hamling v. United States*, 418 U.S. 87, 117 (1974).  An indictment as drafted is presumed sufficient if it tracks statutory language, cites the elements of the crimes charged, and provides approximate dates and times.  *United States v. Chichy*, 1 F.3d 1501, 1504 n.3 (6th Cir. 1993).  When considering a motion to dismiss, a court does not evaluate the evidence upon which the indictment is based.  *United State v. Landham*, 251 F.3d 1072, 1080 (6th Cir. 2001).  And a court may make preliminary findings of fact to decide questions of law as long as those findings "do not invade the province of the ultimate finder of fact."  *United States v. Levin*, 973 F.2d 463, 467 (6th Cir. 1992).  To survive a motion to dismiss, the indictment must assert facts which in law constitute an

offense, and which, if proved, would establish prima facie the defendant's commission

of that crime.  *Landham*, 251 F.3d at 1079.

### B.    Analysis

Defendant moves to dismiss Counts 2-13 and Count 1 to the extent it charges

him with a conspiracy to commit wire fraud.  He argues that for each count, the

indictment either fails to allege an essential element of the charged offense or fails to

allege facts that in law constitute an offense.  The government argues that all of

Defendant's challenges to the indictment cannot be adjudicated without resolving

contested issues of fact, and even if the Court were to consider the facts set forth by

Defendant, his arguments fail as a matter of law.  The government further argues that

the indictment fulfills its obligations to inform Defendant of the charges against him and

to provide sufficient information to adjudicate potential future claims of double jeopardy.

### 1.    Violations of the Clean Air Act

Under 42 U.S.C. § 7413(c)(2)(A), it is prohibited to "knowingly . . . make any false

material statement, representation, or certification in, or omit material information from"

documents filed under the Clean Air Act.  Counts 2-7 charge Defendant with violations

of this statutory provision for alleged misstatements or omissions in documents

submitted by FCA to regulators.  Defendant is charged as a principal and an aider and

abettor.  Defendant argues that dismissal of these counts is warranted because the

indictment does not allege he was responsible for the submissions and with regard to

Counts 2, 3, and 7, because the indictment fails to identify the specific misstatements or omissions.[1]

A review of the indictment reveals that Counts 2-7 track the statutory language, cite the elements of the crime charged, and provide approximate dates and times.  And each count identifies one specific document submitted by FCA in support of its certification applications for the Subject Vehicles.  That Defendant was not employed by FCA at the time of these submissions or directly responsible for the certifications does not preclude a finding that he knowingly caused any misstatements or omissions.  Nor is the indictment required to explain which information is alleged to be false or omitted from the documents.  In sum, the indictment fairly informs Defendant of the charges regarding violations of the Clean Air Act and enables him to plead an acquittal or conviction in bar of future prosecutions for the same offenses.  Thus, these counts survive Defendant's motion.

### 2.    Wire Fraud

Under 18 U.S.C. § 1343, it is a crime to effect with the use of wires "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises."  The Supreme Court has held that under this statute, the government must show not only that the defendant engaged in deception

---

[1] In his motion, Defendant also argues that Counts 2-7 should be dismissed because the indictment fails to allege that he willfully caused FCA to make the alleged misstatements.  The government responds by arguing that to the extent it must prove willfulness, that is an affirmative defense and need not be alleged in the indictment.  At oral argument, Defendant conceded this and withdrew his arguments regarding this issue.  (*See* ECF No. 56, PgID 1468-69.)

but also that an object of that deception was money or property.  *See Kelly v. United States*, 140 S. Ct. 1565, 1571 (2020) (citations omitted).

Counts 8-11 charge Defendant with wire fraud and a portion of Count 1 charges him with conspiracy to commit wire fraud.  These charges are based on four emails involving communications between Defendant and his colleagues at VM Motori, FCA, and FCA's outside counsel.  Defendant argues these counts should be dismissed because the indictment fails to allege a cognizable property interest as the object of the purported scheme to defraud and three of the four counts fail to allege a communication "in furtherance" of the alleged scheme.

First, Defendant argues that to the extent the indictment alleges the purpose of the scheme was to obtain regulatory approval to sell the Subject Vehicles, this cannot be the basis for the wire fraud counts.  *See Kelly*, 140 S. Ct. at 1573 (reaffirming that the "exercise of regulatory power cannot count as the taking of property" for purposes of the property fraud statutes).  The government does not dispute this point but argues that while fraudulently obtaining regulatory approval was a component of the overall scheme,[2] the wire fraud scheme also had the goal of fraudulently obtaining money from potential purchasers of FCA's diesel vehicles.  Defendant responds by arguing that this is simply a repackaging of the deficient "wire fraud on government regulators" theory.  Defendant notes that he is an engineer whose job was to calibrate diesel engines for the supplier and that he was not responsible for selling cars to FCA's customers.  He also asserts that the indictment does not allege that he had any control over how

---

[2] Count 1 also charges Defendant with a conspiracy to defraud the United States and to violate the Clean Air Act.

subject vehicles were marketed, does not indicate how he sought to obtain customers' money, and none of the charged wires were communications with customers.

During oral argument, the government cited *United States v. Seidling*, 737 F.3d 1155, 1160 (7th Cir. 2013), to argue that it does not have to prove that the fraud involved deception of the same person or entity whose money is the ultimate object of the scheme.  In that case, however, the court noted that the defendant, through misrepresentations directed towards the Wisconsin small claims court, "undoubtedly intended for the money or property lost by the victims to ultimately end up in his possession."  *Id.* at 1161.  And in fact, there is a circuit split regarding whether the property fraud statutes require "convergence"—that the party deprived of money or property be the same party who is actually deceived.  *Compare United States v. Blumeyer*, 114 F.3d 758, 767-68 (8th Cir. 1997) (a defendant may be convicted of property fraud for making false representations to parties other than the intended victims of the scheme) *with United States v. Lew*, 875 F.2d 219, 221 (9th Cir. 1989) (a defendant must have the intent to obtain money or property from the victim of the deceit).  In *United States v. Frost*, 125 F.3d 346, 360 (6th Cir. 1997), the Sixth Circuit recognized but declined to resolve this split,[3] noting that "even the cases which have held that convictions may rest upon deceit of a person other than the ultimate victim contemplated that the deception was causally related to the scheme to obtain property from the victim."  The Fifth Circuit has framed the relevant issue as "whether the victims'

---

[3] In *Frost*, 125 F.3d at 360, the Sixth Circuit cited to two First Circuit cases that seemed to indicate that convergence was required.  However, in *United States v. Christopher*, 142 F.3d 46, 54 (1st Cir. 1998), the First Circuit explicitly refused to adopt a convergence theory.

property rights were affected by the misrepresentations." *See United States v. McMillan*, 600 F.3d 434, 449 (5th Cir. 2010).

The government argues that the allegations in the indictment are sufficient to set forth a scheme to defraud victims of money. More specifically, the government avers that regulatory approval was a means to a financial end, and thus the alleged wire fraud scheme also had an object of obtaining money from potential purchasers of FCA's vehicles. Setting aside the lack of convergence under this theory, the Court finds the causal connection between Defendant's alleged deceit and FCA's customers' loss of money tenuous at best. Because the fraud statutes are "limited in scope to the protection of property rights," the loss to the victim cannot be "only an incidental byproduct of the scheme." *Kelly*, 140 S. Ct. at 1571, 1573; *see United States v. Berroa*, 856 F.3d 141, 149-52 (1st Cir. 2017) (reversing mail fraud convictions for "lack of a sufficiently direct causal nexus" where the government alleged that defendants used their fraudulent medical licenses to obtain payment for medical services). Thus, the scheme to defraud alleged in this case, even if proven, is not sufficient to establish that Defendant committed wire fraud.[4] Because the indictment does not state the offense of wire fraud, a conspiracy count based on that same charge is similarly deficient. *See Kelly*, 140 S. Ct. at 1571 n.1. Accordingly, the Court grants Defendant's motion to dismiss the wire fraud charges set forth in Counts 8-11 and Count 1 to the extent it charges Defendant with conspiring to commit wire fraud.

---

[4] Because the Court finds that the allegations in the indictment are not sufficient to constitute wire fraud, there is no need to address Defendant's alternate argument that three of the four counts fail to allege a communication "in furtherance" of the alleged scheme.

### 3.    False Statements

Counts 12 and 13 charge Defendant with making two false statements to federal agents during the interview at his home in violation of 18 U.S.C. § 1001(a).  He argues that the statements underlying these counts are not false on their face.  *See United States v. Gahagan*, 881 F.2d 1380, 1383 (6th Cir. 1989) ("An indictment premised on a statement which on its face is not false cannot survive.") (internal quotation marks and citation omitted).  However, Defendant's arguments do not demonstrate that his statements are "literally and factually correct."  *See id.*  Rather, as noted by the government, they "amount[] only to an assertion that under *some* conceivable interpretation of the questions, his answers would not have been false."  *See United States v. Ahmed*, 472 F.3d 427, 432 (6th Cir. 2006).  "[T]he possibility that a defendant can postulate unstated premises of the question that would make his answer literally true does not bar the possibility of liability. . . . Rather, his argument only raises a jury issue as to a reasonable interpretation of the question and his *actual* understanding." *Id.* at 432 (internal quotation marks and citations omitted).  Moreover, a review of the indictment reveals that Counts 12-13 track the statutory language, cite the elements of the crime charged, and provide approximate dates and times.  In sum, the indictment fairly informs Defendant of these charges and enables him to plead an acquittal or conviction in bar of future prosecutions for the same offenses.  Thus, these counts survive Defendant's motion.

### III.    Defendant's Motion for a Bill of Particulars

#### A.    Legal Standard

Federal Rule of Criminal Procedure 7(f) provides that "[t]he court may direct the government to file a bill of particulars."  A bill of particulars has the following purposes: 1) to insure that the defendant understands the nature of the charges against him to enable him to prepare for trial, 2) to avoid or minimize the danger of unfair surprise at trial, and 3) to enable the defendant to plead double jeopardy if he is later charged with the same crime.  *United States v. Birmley*, 529 F.2d 103, 108 (6th Cir. 1976).  The decision to order a bill of particulars is within the sound discretion of the district court. *United States v. Salisbury*, 983 F.2d 1369, 1375 (6th Cir. 1993).

#### B.    Analysis

Defendant moves the Court to order the government to produce a bill of particulars with the following: (1) with respect to Counts 2-7, which allege violations of the Clean Air Act's false statements provision, identification of the purported misstatements or omissions; (2) with respect to paragraph 95 of the indictment, identification of the alleged "material misrepresentations and omissions" in FCA's April 21, 2017 written response to the EPA; (3) with respect to the purported wire fraud scheme charged in Counts 8-11, identification of (i) the classes of victims from whom Defendant is alleged to have obtained or sought to obtain property and (ii) the means by which Defendant is alleged to have caused misrepresentations to have been made to those individuals; (4) with respect to the purported wire fraud scheme charged in Counts 8-11, identification of the property that Defendant is alleged to have obtained or sought to obtain; and (5) with respect to Counts 1-11, identification of the unindicted co-

conspirators.  The government responds by arguing that Defendant is not entitled to a bill of particulars because the indictment reasonably informs him of the nature of the charges, and the information he seeks is readily available through other sources.

Because the Court is dismissing the wire fraud counts, Defendant's third and fourth requests are denied as moot.  The Court will consider Defendant's first, second, and fifth requests.

Defendant first requests identification of the purported misstatements or omissions underlying Counts 2-7 for reasons similar to those he argued support dismissal of these counts.  More specifically, he notes he was not responsible for the documents, which were submitted by FCA to regulators at a time he was still employed by VM Motori, and that they range in length from 53 to 154 pages.  Defendant also requests identification of the false statements in the document referred to in paragraph 95 of the indictment, which he notes is 154 pages, filled with technical information, and prepared by FCA's outside counsel.

The 38-page indictment in this case is detailed and reasonably informs Defendant of the charges brought against him.  Moreover, the government has provided Defendant with extensive discovery—at the time of its response, the government had produced 542,583 documents comprising 4,559,155 pages.  Defendant argues that voluminous discovery can actually increase the need for a bill of particulars, but, here, the government has organized most of the discovery in a searchable electronic database with accompanying production indexes and has provided Defendant with a separate flash drive containing 693 "hot documents" along with a three-hour reverse proffer.  *Compare United States v. Watts*, No. 04-20223 B, 2007 WL 1231669, at *3

12

(W.D. Tenn. Apr. 25, 2007) (denying a motion for a bill of particulars in part because the government had been cooperative in discovery and produced the documents in a searchable format) *with United States v. McQuarrie*, No. 16-cr-20499, 2018 WL 372702, at *6-7 (E.D. Mich. Jan. 11, 2018) (granting in part a motion for a bill of particulars after noting that a defendant may be denied notice of the charges "when the relevant information is provided in a manner reminiscent of the proverbial needle in the haystack").[5]

Defendant himself concedes that some information regarding the alleged misstatements underlying Counts 4, 5, and 6 can be discerned from the indictment and the reverse proffer.  And while he argues it is difficult to identify the misstatements or omissions in the documents underlying the remaining counts and in the April 2017 response, a "bill of particulars is not intended as a means of learning the government's evidence and theories."  *See United States v. Musick*, 291 F. App'x 706, 724 (6th Cir. 2008) (internal quotation marks and citation omitted).  In sum, the detailed indictment and extensive discovery are sufficient to ensure that Defendant understands the nature of the charges brought against him, can plead double jeopardy later if charged with the same offenses, and will not face unfair surprise at trial.  The Court therefore denies Defendant's first and second requests.

Finally, Defendant seeks the names of the un-indicted co-conspirators.  As he acknowledges, a defendant is not entitled to this information.  *See United States v.*

---

[5] In *McQuarrie*, 2018 WL 372702, at *7, the court also noted that because all of the defendants were represented by appointed attorneys, a bill of particulars would help avoid unnecessary expenses funded by the United States.  By contrast, here, Defendant is represented by a team of privately retained defense attorneys.

*Crayton*, 357 F.3d 560, 568 (6th Cir. 2004) (noting that the government is not required

to provide the names of unindicted co-conspirators in a bill of particulars) (citation

omitted).  Defendant requests, however, that the Court exercise its broad discretion and

order the government to produce these names for practical considerations, including the

interest of efficiency.  The Court declines to do so.  In sum, Defendant's motion for a bill

of particulars is denied in all respects.

## IV.     Defendant's Motion for Discovery Pursuant to Rule 16 and *Brady*

### A.     Legal Standard

In most criminal prosecutions, a defendant is only entitled to discovery under the

following three governing rules: (1) the *Brady* doctrine as set forth in *Brady v. Maryland*,

373 U.S. 83 (1963), and its progeny; (2) Federal Rule of Criminal Procedure 16; and (3)

the Jencks Act, 18 U.S.C. § 3500.  Here, Defendant invokes the first two of these rules.

Under the *Brady* doctrine, the government must provide defendants with material,

exculpatory evidence in its possession.  *See United States v. Presser*, 844 F.2d 1275,

1281 (6th Cir. 1988).  This includes an obligation "to learn of any favorable evidence

known to the others acting on the government's behalf in the case, including the police,"

and to disclose that evidence if material.  *See Kyles v. Whitley*, 514 U.S. 419, 437

(1995).  Under Rule 16, the government is required to disclose, upon a defendant's

request, certain categories of materials that are within the government's "possession,

custody, or control."  *See* Fed. R. Crim P. 16(a).

### B.     Analysis

Defendant seeks an order requiring the government to produce any materials

that are exculpatory under *Brady* or otherwise discoverable under Rule 16 in the

possession of several regulatory agencies that participated in the investigation of Defendant—the EPA, particularly its Office of Transportation and Air Quality ("OTAQ") and its Air Enforcement Division ("AED"); the Environmental Enforcement Section of the Department of Justice ("DOJ-ENRD Civil"); the U.S. Securities and Exchange Commission ("SEC"); and the CARB.[6]  The government acknowledges that these agencies conducted parallel investigations of FCA that overlapped with the government's grand jury investigation but argues that its discovery obligations do not extend to materials from these agencies.

Defendant relies in large part on *United States v. Mills*, No. 16-cr-20460, 2019 WL 3423318, at *3 (E.D. Mich. July 30, 2019), and *United States v. Skaggs*, 327 F.R.D. 165, 174 (S.D. Ohio 2018), to argue that the government is required to disclose all discoverable materials it has "knowledge of and access to" in the possession of any agency that participated in the investigation leading to his indictment.  The government argues this position is contrary to Sixth Circuit law and relies on *United States v. Graham*, 484 F.3d 413 (6th Cir. 2007), to assert it is only required to disclose materials in the possession of members of the prosecution team.  The government further argues that even under the standard set forth by Defendant, he is not entitled to the relief he seeks because the named agencies did not participate in the criminal investigation of

---

[6] Defendant argues that in the event the Court is not satisfied that the evidence establishes the government's knowledge of and access to materials in possession of these civil agencies, the Court should hold an evidentiary hearing.  The government notes, however, that Defendant has made a full record of what took place between the government and these agencies and that this motion turns on the application of the proper legal standard that governs the government's discovery obligations.  Because there are no disputed issues of fact, the Court finds there is no need for an evidentiary hearing.

Defendant and the government does not have knowledge of and access to materials in their files.

In *Graham*, the Sixth Circuit noted that "*Brady* and its progeny have recognized a duty on the part of the prosecutor to disclose material evidence that is favorable to the defendant over which the prosecution team has control." *Id.* at 417. The court went on to hold that that duty did not extend to a cooperating witness, who remained an independent actor, but did not reach the question of whether it could extend to a cooperating witness "sufficiently identified with the prosecution team." *Id.* at 417-18. Thus, *Graham* is not directly on point and does not foreclose Defendant's request in this case.

In *Mills*, 2019 WL 3423318, at *3, the government argued that its disclosure obligations under Rule 16(a)(1)(E) are only triggered by actual, not constructive, possession of materials and only extend to other federal, not state, agencies. The court noted that while this rule does not contain a due-diligence requirement for the government to affirmatively inquire of all federal and state agencies as to whether they had materials that would be discoverable, "when the Government knows that some other agency had some involvement in the investigation of a defendant, including state and local investigative agencies, 'the Government must determine if those other agencies have information embraced within Rule 16(a)(1)(E).'" *See id.* at *3 (quoting *United States v. Gregory*, No. 2:05-CR-64, 2006 WL 8439328, at *3 (E.D. Tenn. Oct. 6, 2006)); *see also United States v. Jordan*, 316 F.3d 1215, 1249 (11th Cir. 2003) ("While Rule 16(a) only applies to materials within the 'possession, custody, or control of the government,' courts have found that the 'possession, custody, or control of the

government' requirement includes materials in the hands of a governmental investigatory agency closely connected to the prosecutor."); *Skaggs*, 327 F.R.D. at 174 ("The prosecution is deemed to have knowledge of and access to material that is in the possession of any federal agency that participated in the investigation that led to defendant's indictment, or that has otherwise cooperated with the prosecution."); *cf. Sutton v. Carpenter*, 617 F. App'x 434, 441 (6th Cir. 2015) (noting that the Sixth Circuit has "rejected *Brady* claims premised on evidence possessed by *uninvolved* government agencies") (emphasis added).  Even some of the Southern District of New York cases relied upon by the government recognize that "where the prosecution conducts a joint investigation with another state or federal agency, . . . the prosecutor's duty extends to reviewing the materials in the possession of that other agency for *Brady* evidence." *See, e.g.*, *United States v. Middendorf*, 18-CR 36(JPO), 2018 WL 3956494, at *4 (S.D.N.Y. Aug. 17, 2018) (internal quotation marks and citation omitted).  The Court therefore finds that the government's discovery obligations extend to civil agencies that were involved in the investigation of a defendant.

Here, with regard to the EPA, the government attempts to draw a line between the EPA's criminal investigation division and its civil enforcement personnel.  Defendant has demonstrated, however, that Mr. Byron Bunker, Director of the Compliance Division of EPA's OTAQ, was in frequent contact with prosecutors and EPA criminal investigators throughout the investigation.  (*See* ECF No. 37-15, filed under seal.)  More specifically, he provided updates about his team's meetings with FCA and copies of the Power point presentations that FCA had submitted to his team.  Moreover, his colleagues in the criminal investigation division called him when they had technical

questions about the Subject Vehicles, asked him about a civil lawsuit that had been filed against FCA, and asked him to respond to information provided by FCA.  Agents also met with Mr. Bunker the day before they interviewed Defendant, and other FCA employees, in their homes.  Members of the EPA's Air Enforcement Division were also involved in at least one meeting with FCA and the director of that division issued a notice of violation to FCA regarding the Subject Vehicles.  The Air Enforcement Division sits within the EPA's Office of Enforcement and Compliance Assurance, and its assistant administrator was quoted in the press release announcing Defendant's arrest.

With regard to DOJ-ENRD Civil, two attorneys from that section attended the June 2016 meeting between FCA and regulators discussed in the indictment.  And in May 2017, these attorneys brought a lawsuit against FCA, on behalf of the United States, for using the same strategies at issue in the indictment in this case.  As part of that lawsuit, a number of depositions took place.  The government has produced the transcripts of more than thirty of those depositions to the defense in discovery, indicating that the government does have access to the agency's materials.  That lawsuit was later consolidated with a multi-district litigation in the Northern District of California and ultimately resolved by a consent decree.  The Judicial Panel on Multidistrict Litigation chose that district in part because CARB "appear[ed] to have played an integral role in investigating and, ultimately, revealing FCA's use of eight [auxiliary emissions control devices]."  *See In re Chrysler-Dodge-Jeep EcoDiesel Mktg.*, 273 F. Supp. 3d 1377, 1379 (J.P.M.L. 2017).  Mr. Bunker also reported speaking to CARB three times per week, and attorneys from CARB attended the June 2016 meeting between FCA and regulators.  The indictment also alleges that Defendant participated

in a meeting with CARB in 2014 and made misstatements during that meeting.  Finally, with regard to the SEC, Defendant notes that he was deposed twice as a part of its investigation into the Subject Vehicles and the government acknowledged reviewing those depositions in the course of its investigation.  The SEC also deposed a number of other witnesses and the government was able to provide Defendant with those deposition transcripts.

In sum, while there is no evidence that personnel from the named civil agencies participated in the decision to charge Defendant, the record shows that they were involved in the investigation and provided detailed information regarding the facts and allegations that led to the indictment in this case.  *Cf. United States v. Martoma*, 990 F. Supp. 2d 458, 460-61 (S.D.N.Y. 2014) (when assessing whether a "joint" investigation took place, "courts look to whether the agencies are engaged in joint fact-gathering, even if they are making separate investigatory or charging decisions") (internal quotation marks and citation omitted).  The government is therefore required to determine whether these agencies have any additional materials that fall within the scope of *Brady* and Rule 16.  Notions of fundamental fairness support this conclusion. *See United States v. Trevino*, 556 F.2d 1265, 1272 (5th Cir. 1977) (noting that "the prosecutor would not be allowed to avoid disclosure of evidence by the simple expedient of leaving relevant evidence to repose in the hands of another agency while utilizing his access to it in preparing his case for trial; such evidence is plainly within his Rule 16 'control'"); *United States v. Grace*, 401 F. Supp. 2d 1069, 1079 (D. Mont. 2005) (noting "[t]he prosecution may not simply ask for information it wants while leaving behind other, potentially exculpatory information within agency files").  And while the

government argues that Defendant may obtain the requested materials through a Rule 17 subpoena, as the government itself notes, a Rule 17 subpoena does not eliminate the requirement that it meet its own discovery obligations.  Thus, the Court grants Defendant's motion for discovery with regard to the named agencies that were involved in the investigation of this case.

## V.    Defendant's Motion to Strike Surplusage

### A.    Legal Standard

Under Federal Rule of Criminal Procedure 7(d), "[u]pon the defendant's motion, the court may strike surplusage from the indictment."  "The Rule is properly invoked when an indictment contains nonessential allegations that could prejudicially impress the jurors."  *United States v. Kemper*, 503 F.2d 327, 329 (6th Cir. 1974).  Because this rule is "strictly construed against striking surplusage," *id.*, a motion to strike surplusage should only be granted if the language in the indictment is both legally irrelevant and prejudicial, *see United States v. Moss*, 9 F.3d 543, 550 (6th Cir. 1993) (citation omitted). "The striking of language from an indictment as surplusage addresses itself to the sound discretion of the district court."  *See Kemper*, 503 F.3d at 329 (citation omitted).

### B.    Analysis

Defendant moves to strike as surplusage the second sentence (in bold) found in paragraph 41 of the indictment, which reads in full as follows:

> Specifically, because disclosure of these emissions control strategies carried a risk that FCA's Regulators would not agree that these strategies, and the resulting increase in NOx emissions, were justified under the relevant regulations, PALMA and his co-conspirators concealed that they had calibrated the EGR rate and DEF dosing rates on the Subject Vehicles to perform differently "on cycle" versus "off cycle."  **PALMA and his co-conspirators also concealed that they did not calibrate the emissions control systems used in the Subject Vehicles to maximize the**

> reduction of NOx emissions, but instead calibrated the emissions
> control systems to increase emissions under conditions that they
> believed would make the Subject Vehicles more attractive to FCA's
> potential customers, *i.e.*, by increasing fuel economy and reducing the
> SCR system's DEF consumption.

(ECF No. 1, PgID 15-16 (emphasis added).)  Defendant argues that the second

sentence of this paragraph implies that "the relevant regulations" mentioned in the

preceding sentence required him to calibrate the emissions control systems used in the

Subject Vehicles in a way that maximizes the reduction of NOx emissions.  Defendant

notes that the Clean Air Act and the EPA's implementing regulations do not impose

such a requirement but rather require only that NOx emissions not exceed certain

thresholds.  In light of the underlying subject matter and complexity of this case,

Defendant argues that this sentence poses a risk of jury confusion.  The government

responds by arguing that this sentence is relevant to the charged scheme as well as to

Defendant's motive and intent.

As a preliminary matter, the Court notes that Defendant's motion asks the Court

to strike the entire sentence at issue.  At oral argument, however, after the government

noted that Defendant's concerns relate primarily to the first clause of the sentence,

Defendant agreed it would be sufficient for the Court to strike only that clause.  (*See*

ECF No. 56, PgID 1521.)  Accordingly, the Court's analysis will focus on the first clause

of the second sentence in paragraph 41 of the indictment.  The Court agrees with

Defendant that this clause suggests he was obligated to calibrate the emissions control

systems in the Subject Vehicles to maximize the reduction of NOx emissions and that

he acted improperly by not doing so.  Because the government does not assert that the

regulations impose such a requirement, this implied allegation is not essential to the

indictment and is unduly prejudicial. The Court therefore grants Defendant's motion to strike in part. *Cf. United States v. Marlinga*, No. 04-80372, 2005 WL 517964, at *5 (E.D. Mich. Mar. 2, 2005) (striking language that could lead jurors to infer that the defendant engaged in uncharged offenses). The following language—"also concealed that they did not calibrate the emissions control systems used in the Subject Vehicles to maximize the reduction of NOx emissions, but instead"—is stricken as surplusage from the indictment.

## VI. Conclusion

For the above-stated reasons,

IT IS HEREBY ORDERED that Defendant's motion to dismiss is GRANTED IN PART AND DENIED IN PART. More specifically, the counts charging Defendant with wire fraud (Counts 8-11) and Count 1 to the extent it charges Defendant with conspiracy to commit wire fraud are DISMISSED. The remaining counts charged in the indictment survive Defendant's motion.

IT IS FURTHER ORDERED that Defendant's motion for a bill of particulars is DENIED.

IT IS FURTHER ORDERED that Defendant's motion for discovery is GRANTED. The government is ORDERED to produce any additional materials it determines fall within the scope of *Brady* and Rule 16 in the possession of the named civil agencies.

FINALLY, IT IS ORDERED that Defendant's motion to strike surplusage is GRANTED IN PART. The first clause of the second sentence in paragraph 41 of the indictment, as indicated above, is STRICKEN as surplusage.

SO ORDERED.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated: November 17, 2020

I hereby certify that a copy of the foregoing document was served upon counsel of record on November 17, 2020, by electronic and/or ordinary mail.

s/Lisa Bartlett
Case Manager