# UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | 100 EAST FIFTH STREET, ROOM 540 | |
|---|---|---|
| Deborah S. Hunt | POTTER STEWART U.S. COURTHOUSE | Tel. (513) 564-7000 |
| Clerk | CINCINNATI, OHIO 45202-3988 | www.ca6.uscourts.gov |

Filed: January 18, 2023

Mr. Greg D. Andres
Ms. Anne Collins
Davis, Polk & Wardwell
450 Lexington Avenue, 30th Floor
New York, NY 10017

Mr. Andrew Laing
Mr. Jeremy Raymond Sanders
U.S. Department of Justice
Criminal Division
1400 New York Avenue, N.W.
Washington, DC 20005

Mr. Kenneth Marc Mogill
Mogill, Posner & Cohen
27 E. Flint Street, Second Floor
Lake Orion, MI 48362-0000

Mr. Paul Nathanson
Mr. Nino Stamatovic
Davis Polk & Wardwell
901 15th Street, N.W.
Washington, DC 20005

Mr. John K. Neal
Office of the U.S. Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226

    Re:  Case No. 21-1782, *USA v. Emanuele Palma*
          Originating Case No. : 2:19-cr-20626-1

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

                Yours very truly,

                Deborah S. Hunt, Clerk

                Cathryn Lovely
                Deputy Clerk

cc:  Ms. Kinikia D. Essix

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 23a0010p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

    *Plaintiff-Appellant*,

  *v*.

EMANUELE PALMA,

    *Defendant-Appellee*.

No. 21-1782

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:19-cr-20626-1—Nancy G. Edmunds, District Judge.

Argued: October 20, 2022

Decided and Filed: January 18, 2023

Before: COLE, GIBBONS, and BUSH, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Andrew W. Laing, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. Greg D. Andres, DAVIS, POLK & WARDWELL LLP, New York, New York, for Appellee. **ON BRIEF:** Andrew W. Laing, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., John K. Neal, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellant. Greg D. Andres, Paul J. Nathanson, DAVIS, POLK & WARDWELL LLP, New York, New York, Kenneth M. Mogill, MOGILL, POSNER & COHEN, Lake Orion, Michigan, for Appellee.

---

**OPINION**

---

    JOHN K. BUSH, Circuit Judge. Defendant Emanuele Palma was indicted for several crimes, including conspiracy to commit wire fraud. The indictment alleges that Palma and others

conspired to falsify test results for a new diesel engine and market these engines as environmentally friendly, meeting regulatory standards, and "best-in-class" compared with other diesel engines. The district court dismissed this count since, in its view, the property loss by consumers was too far removed from the falsified test results, which, the court reasoned, were meant to deceive regulators. Because Palma is only charged with conspiracy, not wire fraud itself, and because the indictment alleges adequate facts tying Palma to a fraudulent scheme, we REVERSE.

I

In 2010, Fiat Chrysler Automobiles N.V. (FCA) began developing a new diesel engine for several types of vehicles. Defendant Palma worked for FCA starting in 2013. Also named in the superseding indictment are Sergio Pasini, a head calibration engineer who supervised Palma, and Gianluca Sabbioni, a technical director who supervised Pasini.

Palma led a team of engineers who developed and calibrated diesel engines for use in FCA's vehicles. Diesel-fueled engines use a combination of systems to reduce emissions and improve fuel economy and performance. But these systems are a double-edged sword. For one, the Exhaust Gas Recirculation system lowers emissions, but it reduces fuel economy. And Selective Catalytic Reduction, or the injection of ammonia fluid into the exhaust to reduce emissions, consumes diesel exhaust fluid, requiring owners to replenish the fluid more frequently.

The indictment alleges that Palma participated in a scheme that manipulated the diesel engine's function during testing to produce artificially impressive results. Using the software programs known as "T_eng," "Standard Dosing," and "Online Dosing," Palma and others allegedly made the engine appear to offer features that FCA was targeting to customers, including a fuel economy of greater than 30 miles per gallon and a frequency of fluid changes similar to that of standard oil changes for gasoline-powered cars. The indictment alleges that Palma and others achieved these standards by manipulating the engine's operation during testing. When the vehicles were tested for emissions, the program activated Exhaust Gas Recirculation, sacrificing fuel economy. When the vehicles were tested for fuel economy or driven under real-

No. 21-1782　　　　　　　　　　　*United States v. Palma*　　　　　　　　　　　Page 3

world conditions, T_eng lowered Exhaust Gas Recirculation, which improved fuel economy but increased emissions.  Similarly, for the diesel engine fluid, Palma and co-conspirators allegedly used Dosing programs to selectively reduce emissions or ease fluid consumption during the respective testing.  Palma and co-conspirators allegedly referred to this tactic as "cycle beating," referring to adjusting performance during the regulatory testing cycle.

　　　The indictment alleges the following. Palma and his co-conspirators knew that these testing results were critical to marketing the vehicles to consumers, including receiving the "best-in-class" fuel economy ratings and being able to market the vehicles as using "clean" diesel. Palma knew that false and misleading claims were being made to consumers and participated in making these claims.  Emails and documents provided by the government show Palma was aware that the marketing of the vehicles was in jeopardy because of failure to meet performance standards.  In fact, Palma knew that the engine could not meet the standards and the "cycle beating" strategy was the only way to pass them.  On January 30, 2014, Palma received an email indicating EPA confirmed the fuel efficiency label showing 28 miles per gallon on the highway. Palma responded, "Best in class, great job."  Because of Palma's use of cycle beating, he was aware that the vehicles did not meet EPA requirements or the requirements for "best-in-class." Yet he was also aware that the vehicles were marketed as having "best-in-class fuel economy" and delivering "clean-diesel technology," claims he knew were false.  In addition, a sticker affixed to the cars' windows stated the cars complied with regulations and provided detailed emissions information, as influenced by the cycle beating that Palma used.  Palma was informed by email that EPA approved this label for placement on the vehicle.

　　　According to the indictment, the scheme's goal was

> for **PALMA, PASINI, SABBIONI,** and their co-conspirators to obtain money and property for FCA through the production and sale of Subject Vehicles that they knew did not comply with EPA rules and regulations governing emissions by (a) making and causing others to make material misrepresentations to FCA's Regulators, and (b) making and causing others to make material misrepresentations to purchasers and potential purchasers of the Subject Vehicles.

FCA sold more than 100,000 of these vehicles (amounting to more than $4 billion in customer payments), which purportedly were legal to sell, compliant with federal regulations, and rated

"best-in-class" for fuel efficiency.  Per the indictment, customers who purchased the vehicles have said that the false and misleading representations were material to their purchase decisions.

In 2019, the grand jury indicted and arrested Palma, charging him with thirteen counts. The count appealed here is conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349. The district court held that there was an insufficient causal nexus between Palma's conduct and customers being induced to purchase vehicles.  Referencing proximate causation, it concluded that there were two intervening circumstances.  First, Palma was not personally responsible for marketing.  Second, Palma's marketing goals were "intertwined" with obtaining regulatory approval.  Therefore, under *Kelly v. United States*, 140 S. Ct. 1565 (2020), the district court concluded Palma's conduct was less a deprivation of consumer property and more a deception of regulators.  The United States timely appealed.

II

We review de novo the legal question of whether the offense's elements are adequately alleged in the indictment.  *United States v. Maney*, 226 F.3d 660, 663 (6th Cir. 2000) (citing *United States v. Superior Growers Supply, Inc.*, 982 F.2d 173, 177 (6th Cir. 1992)).  An indictment must be a "plain, concise, and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c)(1).  To be legally sufficient, an "indictment must assert facts which in law constitute an offense; and which, if proved, would establish prima facie the defendant's commission of the crime."  *United States v. Landham*, 251 F.3d 1072, 1079 (6th Cir. 2001) (quoting *Superior Growers*, 982 F.2d at 177).  Although the statutory language of the offense may be used, it "must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense."  *Id.* (quoting *Hamling v. United States*, 418 U.S. 87, 117–18 (1974)).  Courts reviewing a motion to dismiss "do not evaluate the evidence upon which the indictment is based."  *Id.* at 1080 (citing *Costello v. United States*, 250 U.S. 359, 362–63 (1956)).

III

Wire fraud is the use of interstate or foreign communications for the purpose of executing a scheme to defraud others of property.  18 U.S.C. § 1343.  Wire fraud consists of three

elements: the defendant (1) devised or willfully participated in a scheme to defraud, (2) used an interstate wire communication in furtherance of the scheme, and (3) intended to deprive a victim of money or property." *United States v. Rogers*, 769 F.3d 372, 377 (6th Cir. 2014). The deprivation of property must be an object of the scheme, not merely incidental to it. *Kelly,* 140 S. Ct. at 1573.

Under 18 U.S.C. § 1349, a conspiracy to commit wire fraud is punishable by the same penalties as wire fraud itself. A conspiracy to commit wire fraud requires that two or more persons conspired, or agreed, to commit wire fraud and the defendant knowingly and voluntarily joined the conspiracy. *Rogers*, 769 F.3d at 377; Sixth Circuit Pattern Criminal Jury Instruction 3.01B(2).

The key question on appeal is whether there is a sufficient causal nexus between the conduct of Palma and co-conspirators and a deprivation of property. *See United States v. Berroa*, 856 F.3d 141, 152–53 (1st Cir. 2017); *see also United States v. Frost*, 125 F.3d 346, 354 (6th Cir. 1997) (citing *American Eagle Credit Corp. v. Gaskins*, 920 F.2d 352, 353 (6th Cir. 1990)) (explaining mail fraud requires a deprivation of property). In considering this question, it is important to recognize two issues about the disposition of the appeal: first, that it comes at the pleading stage, and second, that the count is for conspiracy to commit wire fraud, not for wire fraud itself. Therefore, the government need only allege facts showing that the conspiracy as a whole had the object of using deception to deprive consumers of property, and Palma joined the conspiracy.

Palma relies on the distance between his alleged conduct and the property losses consumers suffered. Specifically, he asserts that the indictment does not allege he communicated with any of FCA's customers or was personally involved in marketing strategy. Further, as to the stickers affixed to the vehicles' windows, he asserts there were no allegations that the information on the stickers was a communication Palma made or caused to be made to customers. Rather, he believes the government is overcoming the lack of connection through conclusory allegations about his participation in making misstatements. Any involvement he may have had in defrauding FCA's regulators, he contends, was attenuated from the scheme to defraud customers.

In particular, Palma relies on *Kelly*, in which the Supreme Court held that realigning traffic lanes for political reasons failed to meet the property requirement for property fraud. 410 S. Ct. at 1568–69. In that case, the government alleged two theories of property derivation: first, the loss of property from the "commandeering" of the bridges; and second, the loss of a public employee's paid time. *Id.* at 1572. The Court held that the scheme was intended to alter a regulatory choice about the use of the bridges, rather than to take the bridges as property. *Id.* Further, the minimal loss of public employees' paid time to execute the scheme was only incidental; the scheme, at its core, was political in nature. *Id.* Therefore, the Supreme Court reversed the convictions. *Id.* at 1569.

Certain differences make *Kelly* an inapt case for comparison. For one, *Kelly* took place in post-conviction proceedings, whereas Palma challenges an indictment, and therefore we take the government's allegations as true and do not test the evidence behind its claims. *Landham*, 251 F.3d at 1079–80. What's more, FCA sold billions of dollars' worth of cars, which would amount to a serious deprivation of property if the allegations in the indictment are true. This property loss is both much more significant than the loss in *Kelly* and much more connected with the alleged scheme. *See Kelly*, 140 S. Ct. at 1573 (holding defendants regulated, but did not commandeer, traffic lanes). The indictment suggests a cooperative effort by many employees, including Palma, designing and marketing these vehicles with the clear intent that the vehicles be sold to consumers. Indeed, it is unclear what purpose Palma and co-conspirators might have had in bringing the vehicles to market other than to sell them. No such alleged deprivation of property, directly connected with the purpose of the scheme, can be found in *Kelly*.

Still, a loss of property does not always stem from alleged illegal conduct, as in the case of *United States v. Berroa*, 856 F.3d 141 (1st Cir. 2017), which Palma relies on. There, the government argued that convicted defendants who falsified test scores to obtain medical licenses and then practiced medicine perpetrated property fraud on health care benefit programs and health care consumers. *Id.* at 149. The First Circuit reasoned that this theory of fraud would greatly expand federal jurisdiction by allowing fraud prosecutions where "the underlying fraudulent scheme, and the mailing in furtherance thereof, is far removed from any money or property." *Id.* at 152; *see also United States v. Frost*, 125 F.3d 346, 358–60 (6th Cir. 1997)

("[E]ven the cases which have held that convictions may rest upon the deceit of a person other than the ultimate victim contemplated that the deception was causally related to the scheme to obtain property from the victim."). Therefore, the First Circuit reversed the convictions based on insufficiency of the evidence. *Berroa*, 856 F.3d at 154.

*Berroa* is not persuasive here—and as a First Circuit case, it certainly is not binding. First, *Berroa* left intact the conspiracy convictions, while reversing the fraud convictions. *Id.* at 20–21. Also, unlike in *Berroa*, where the purpose of fraudulently obtaining medical licenses was to practice medicine, 856 F.3d at 147, the goal of "cycle beating" and falsely inflating the engines' performance was, the government alleges, to induce customers who otherwise would not have bought the vehicles to do so. It is uncontested that the government has alleged that Palma engaged in deceptive conduct in conjunction with other employees to deceive regulators. Further, it is also uncontested that the government-approved vehicles have been sold for revenues running in the billions of dollars. Unlike *Berroa*, the case at bar is clearly about property. And it is plausible that the scheme's goal was not merely to deceive regulators but also to sell the resulting products to consumers.

Palma also zeroes in on marketing, arguing that any allegations of his participation in marketing the vehicles to consumers are "conclusory." Because the count in question is for conspiracy, the government need not allege that Palma participated in all aspects of a conspiracy, only that he knowingly and voluntarily joined a conspiracy to commit wire fraud. *Rogers*, 769 F.3d at 377. "[F]or purposes of the indictment the government has pleaded sufficiently" that Palma participated in a deceptive scheme to defraud consumers, regardless of any participation in marketing. *See United States v. Douglas*, 398 F.3d 407, 418 (6th Cir. 2005). Even so, the government does allege participation in communications with consumers, which reinforce his apparent participation in a conspiracy.

Weighing the issues and considering the relatively lenient standard for pleading charges in an indictment as opposed to proving them at trial, the government has met its bar of alleging a conspiracy to commit wire fraud. Based on these alleged facts, it is eminently plausible that an object of this scheme was to deceive consumers in order to falsely induce them to purchase goods.

No. 21-1782                     *United States v. Palma*                     Page 8

One last point: Palma alleges there is a fundamental inconsistency in the government's allegations that Palma and others used cycle beating to deceive regulators and consumers but also to fix problems with the vehicles, including a misfire issue. Assuming it is true that Palma and the alleged co-conspirators found another use for the T_eng protocol to fix a specific vehicle issue, that does not bear on whether they used T_eng to artificially inflate the vehicles' performance and participated in a conspiracy to defraud consumers. A consumer driving a vehicle with the new diesel engine, whether using the T_eng protocol or not, has suffered the same injury—purchasing a vehicle with inferior fuel economy and emissions and that passed regulatory muster through deception, at least according to the indictment.

IV

In sum, the indictment has made out the allegations and facts necessary for conspiracy to commit wire fraud. We therefore **REVERSE** the order of the district court and **REMAND** for further proceedings consistent with this opinion.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 21-1782

UNITED STATES OF AMERICA,

    Plaintiff - Appellant,

  v.

EMANUELE PALMA,

    Defendant - Appellee.

**FILED**
Jan 18, 2023
DEBORAH S. HUNT, Clerk

Before: COLE, GIBBONS, and BUSH, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is REVERSED, and the case is REMANDED for further proceedings consistent with the opinion of this court.

**ENTERED BY ORDER OF THE COURT**

Deborah S. Hunt, Clerk